13 727.
181 525

WILLIAM TYSON and ANN TYSON HIS WIFE, Plaintiffs in Error, *v.* JAMES POSTLETHWAITE and MARY POSTLETHWAITE HIS WIFE, GEORGE VICKERS, ELLEN VICKERS, THOMAS POSTLETHWAITE, DANFORTH NETTLETON, MARGARET NETTLETON, WILLIAM FRANK, ISABELLA FRANK, JOHN POSTLETHWAITE, LAWRENCE FAGAN, and GEORGE POSTLETHWAITE, Defendants in Error.

## ERROR TO BOON.

### CONSTRUCTION OF STATUTES. — REPEAL BY IMPLICATION.

Where the legislature passes a law, the manifest object of which is to extend a benefit, or create a right, under a misapprehension or in ignorance of the existence or effect of a former law, which extended a greater benefit, or created a greater right, than that provided by the new law; the first law is not repealed or affected by the last, so as to limit or abridge the right or benefit, so as to restrict it within the limits of the

last law, unless there are restrictive words showing an intention, that no greater right or benefit shall be enjoyed than is provided in the last law.

A law is not repealed by implication, where the legislature had no design to repeal it, unless the provisions of the new law show an intention, that such provisions as are contained in the old law, should no longer continue in force.

In this State, where a man dies intestate, leaving a widow but no descendants, the widow inherits, as heir of the intestate, one half of the real and all of the personal estate of which her husband died seized, which shall remain after the payment of his debts, and she is also entitled to her dower.

The 15th section of the 34th chapter of the Revised Statutes, does not repeal any portion of the 46th section of the 109th chapter.

THIS bill was filed by the complainants against the defendants below, at the May term, 1848, of the Boone Circuit Court. At the December term, 1849, the case was brought to a hearing upon pleadings and proofs, HENDERSON, Judge, presiding, and was taken under advisement till the April term, 1850, when a decree was entered declaring the complainants, as the heirs of Mary Tyson, the widow of the intestate, to be entitled to one half of the real estate of which the intestate died seized; and the defendant below, William Tyson, to be entitled to the other half, and appointing commissioners to make partition of the premises, who, at the December term, 1850, reported the division which they had made, which report was approved by the court, and a final decree entered accordingly. To reverse these orders and decrees, the defendants below have brought the record here by writ of error.

The opinion of the court contains a sufficient statement of the facts of the case for a full understanding of the questions decided.

F. BURNAP, and W. T. BURGESS, and G. W. KULSINGER, for the plaintiffs in error.

A. C. FULLER and J. MARSH, for the defendants in error.

CATON, J. On the 17th of September, 1846, Isaac Tyson, of Bonne county, departed this life intestate, leaving Mary Tyson, his widow, and William Tyson, an only brother, who resided in England. He left neither children nor the descendants of children.

No administration was taken out upon the estate, but the widow paid the debts out of the personal estate. He left a considerable real estate situated in Boone county. On the 16th of August, 1847, Mary Tyson departed this life intestate, leaving the complainants her only heirs at law. The bill alleges that Mary Tyson did not, during her lifetime, elect to take her dower in the premises of which her husband had died seized, nor did she in any way relinquish her inheritance therein, but elected to take by inheritance. The bill also claims that she did, upon the decease of her husband, inherit one half of the real estate and all of the personal estate of which he died seized. The complainants claim to have inherited one half of the real estate from Mary Tyson, and the bill seeks a partition of the premises according to the respective rights of the parties. A decree was entered according to the prayer of the bill, and the case is brought here by William, the only brother of Isaac Tyson, deceased, claiming to have inherited all of the real estate of which his brother died seized, subject only to the right of dower in the widow. There is no question of fact controverted in the case, except as to an alleged election made by the widow to take by inheritance one half of the real estate. Upon this point, therefore, it may be proper to advert more particularly to the evidence.

Mr. Burgess, an attorney at law, testifies that in February, 1847, he was consulted by Mary Tyson in relation to her late husband's estate, and that he prepared for her a letter addressed to the defendant, William Tyson, and also a power of attorney for him to execute, authorizing some one to act for him in relation to his interest in the said estate. These he gave to Mrs. Tyson, who took them away with her. The testimony of Mr. Neely shows that he mailed this letter to Liverpool, the place of residence of William Tyson, to whom it was directed, together with one written by him and signed by Mary Tyson to her brother-in-law on the same subject, inclosing also the power of attorney prepared by Mr. Burgess; and it satisfactorily appears in the record, that this package was received by Mr. Tyson in the due course of mail. In the letter which Mr. Burgess wrote, he professed to act as the legal adviser of Mrs. Tyson. It states that Isaac Tyson died seized of the real estate situate in Boone county, of

which a description was sent; that he died intestate, leaving a widow but no descendants; and that in such case, by the laws of this State, the widow inherits one half of the real and all of the personal estate, and that William Tyson, the only brother of the deceased, would inherit the other half of the real estate. It also states that by the laws of this State aliens may inherit and hold lands. It suggests that William Tyson may wish to dispose of his interests in the premises, or, at any rate, that they should be divided; and points out the course, which he should pursue, should he desire to do so. The record does not contain a copy of the letter which Mr. Neely wrote for Mrs. Tyson to her brother-in-law, but in his testimony he gave the substance of it without objection. Mr. Neely states that the letter which he wrote contained in substance the same as that of Mr. Burgess. He says, " I wrote to him, in this same letter, that she wanted her half of the land in controversy, which half she was entitled to. Also, in substance, that she was entitled to one half of the land, and he to the other half; and if he was disposed to give her the other half of the land, the papers showed how it was to be done.". No proceedings were ever instituted in any court by Mary Tyson for the purpose of making any election, nor for any other purpose, from which an election in that mode might be inferred; but if it was competent for her to make an election *in pais,* I think the proof clearly shows that she did make such election with sufficient distinctness. She wrote to the other heir, " that she wanted her half of the land." By this she certainly expressed to him, who was the only other person interested, that it was her determination and design to take, have, and enjoy one half of the land of which her husband died seized, without, it is true, manifesting a design of relinquishing her dower; for that land was the subject of both communications, and I am of opinion that if the widow was bound to elect to take one half of the land, to entitle her to hold it, that such election or choice might be made *in pais,* and that here is sufficient evidence of such election, which was brought home to the party to be affected by the election, and who was entitled to the other half. I can see no necessity for the expense and delay of a formal proceeding in court against a party out of its jurisdiction and resident in a

foreign country, for the purpose of signifying to him who alone could be interested in the fact, that she intended to take one half of the estate, when a direct communication to him in a tangible form, which she could not afterwards contradict or retract, of her intention and choice, had been given. Such a notice would subserve a much more beneficial purpose to him than would the mere imaginary notice of a proceeding in some court, of which, in all human probability, he would know nothing. If she must make her election by some legal proceeding, it may well be asked, whether the Circuit or the Probate Court is the proper forum, or in what court she should proceed? — what sort of a suit shall be instituted? — shall it be in chancery or at common law? — who shall be made parties, and how shall they be brought into court? I confess that I should feel unable to give safe advice on these questions.

But we think the rights of the widow stand upon higher grounds than that of any election, and upon those grounds we choose to place our decision.

The forty-sixth section of our statute of wills, which is a reënactment of the forty-third section of the act of the 23d of January, 1829, provides as follows: " When there shall be a widow, and no child or children, or descendants of a child or children of the intestate, then the one half of the real estate and the whole of the personal estate shall go to such widow, as her exclusive estate forever, subject to her absolute disposition and control, to be governed in all respects by the same rules and regulations as are or may be provided in cases of *femes sole.*" This is a part of the section which regulates the course of descent in this State; and by it we all agree the widow is made the heir of the husband, from whom she inherits the one half of the real and the whole of the personal estate. Upon his decease, the title immediately vested in her, as much, and to the same extent, as did the other half in the other heirs, and this, too, without any act or even volition on her part. Nor was her right to dower in the other half in the least thereby impaired or abridged; for the last words of the section are, " saving to the widow, in all cases, her dower, as provided by law."

That such are the provisions of the old law is too plain to

require the least discussion; and the only remaining question that we shall examine is, whether this provision has been repealed by the fifteenth section of the thirty-fourth chapter Rev. Stat., entitled " Dower." That section was first introduced into our law in the revision of 1845, in which was reënacted the statute first quoted, in the 46th section of chapter 109 Revised Statutes, entitled " Wills." The 15th section of the dower act is as follows: " If a husband die leaving a widow, but no children nor descendants of children, such widow may, if she elect, have, in lieu of her dower in the estate, of which her husband died seized, whether the same shall have been assigned or not, absolutely in her own right, as if she were *sole*, one half of all real estate which shall remain after the payment of all just debts and claims against the deceased husband. Provided, that, in case dower in such real estate shall have been already assigned, she shall make such new election within two days after being notified of the payment of such debts and claims." · That this section was introduced into the Revised Statutes under a misapprehension as to what the widow's rights were, as secured by the former law, there can be no doubt. The manifest object of this law was to extend the rights of the widow, and not to curtail them, which would be the case should this be held to repeal the former law, and to contract them within the limits' here prescribed. This section was introduced with the evident intention of benefiting the widow, and not for the purpose of injuring her. The phraseology in which the provisions of this section is expressed shows that it was enacted for the benefit of the widow, and that the legislature supposed' that, without it, her rights were more limited than with it. The provison is, that she " may, if she elect, have, in lieu of dower," &c. Now here, it will be seen, that affirmative action on her part is made necessary to give effect to the law, or to put it in operation, with the manifest expectation that the advantages presented in the law would be sufficient, in certain cases, to prompt the widow to make the election; and that, when she did not think it to her advantage to make the election, or rather " such new election," her rights were to be determined by the law as it stood before. The proviso speaks of a new election, which presupposes a previous

Tyson et ux. *v.* Postlethwaite et al.

election to have been made to take dower, by which it was manifestly supposed she would have abandoned or relinquished her inheritance. Whereas, as we have already seen, that she was entitled to dower and the inheritance; nor was any election or other affirmative action, on her part, required to secure to her these rights, but they were cast upon her by force of the law itself. Nor does the 15th section of the chapter concerning dower make any allusion to, or provision concerning, the personal estate, the whole of which she inherits under the law of 1829, which was manifestly overlooked in the adoption of the new law. Had it been the intention of the legislature to deprive the widow of this or any other right already secured to her, they would have clearly expressed it by affirmative provisions, and not left it to doubtful implication. The provisions of the fifteenth section are not, that she shall have no more than is therein provided for her; but, in the event she elects to take it, she shall have that much. Supposing that there was no law authorizing the widow to take both dower and one half of the real estate, and apprehending that she might, under the erroneous supposition that there were debts to exhaust the estate, improvidently elect to take dower, which would be unaffected by the debts, instead of the one half of the real estate which would be left after the payment of the debts, this provision was inserted, authorizing her to determine which she would take, after she was enabled to determine, upon the settlement of the estate, which was most valuable to her. Believing that, as the law then stood, sound policy required affirmative legislation to extend the widow's rights, the law was passed granting her this much, when it is by no means certain that, had the extent of her previous rights been fully understood, that the legislature would have felt called upon to take from her what had been previously secured, and limit her rights to what was then affirmatively granted. We ought not to hold, unless compelled by some inflexible rule of law, that the legislature have undesignedly repealed the former law, and thus unintentionally abridged the widow's rights, when it was their design to extend them. In this statute there is no repealing clause, nor any expression manifesting any design to repeal or limit any former

law; and we ought not, in such a case, to hold that there was a repeal by implication. When we hold a statute to be repealed by implication, we do it as much in obedience to legislative will as where it is repealed by an express provision to that effect. The mere supposition .by the legislature, to be inferred. from a law which they have passed, that the previous law is different from what it in truth is, does not make the law as they supposed it was, or different from what it was in truth. Because there was no intention to repeal the former law; and because there was no affirmative provison of the new law, which could not stand while the old law continued in force, there was no repeal of the old law, the provisions of which the legislature had over- looked. This principle is illustrated in the opinion of Lord Chief Justice North and the other judges, in answer to a ques- tion put to them by the Privy Council, reported by Sir Thomas Raymond, at page 397. There a perpetual law had been passed, granting certain revenue out of strong liquors; and subsequently another law was passed, granting the same revenue for two years; and it was held that the last law did not repeal the first, but that the latter continued after the expiration of the former. "According to the case of the prices of wine, Hob. 215, where, by 37 Henry 8, chap. 23, a perpetual law was made for settling prices of wine; then, by the statute of 5 Edward 6, the said perpetual act (through the inadvertence of parliament) was continued, amongst other acts, till the end of the parliament, which continuance was resolved to be idle as to that act; for an affirmative continuance of a perpetual statute cannot work an abrogation thereof." The copy of Hobart which we have does not contain a full report of this case, but this reference to it may undoubtedly be relied upon; and it is certainly a very strong case against a repeal by implication, where the legislature acted in ignorance of the provisions of the former law; for, by ex- pressly providing that the old law should continue to the end of the parliament, a pretty strong implication is raised, that they did not intend that it should continue longer. But, as the new law was designed to extend the provisions of the old one, it should not be held to restrict them. But we have a very strong case in our own reports, showing that a law passed under a

Tyson et ux. *v.* Postlethwaite et al.

misapprehension of the provisons of a former law, does not change or control the construction of the former law, and that, too, when the new law was of the highest and most obligatory character — the State Constitution. I refer to the case of Boon *v.* Juliet, 1 Scam. 258. By virtue of the territorial laws, the owners of slaves were authorized to introduce them into this territory, and hold them to service here, by registering those under the age of fifteen years with the clerk of the Circuit Court; but those over that age were required to enter into indentures with the master before the same clerk, and in case of their refusal to do so, the owner was allowed a certain time to remove them from the State. And the territorial laws further provided, that children born of registered servants should serve the owners of the mothers, — males till the age of thirty, and females till the age of twenty-eight years. No provision, however, was made subjecting the children of registered servants to any period of service whatever. Thus stood the law at the time of the adoption of our first Constitution, in 1819. The third section of the sixth article of that Constitution declared, that both the registered and indentured servants should serve out the time appointed by their contracts of indenture, or the laws under which they were registered; but it provided, that children thereafter born of either class of servants should become free, — the males at the age of twenty-one years, and females at the age of eighteen years. Although here was a pregnant inference, that it was the design of those who framed and of those who adopted that Constitution, that the children of both classes of parents should serve the owners of their mothers till the term when the Constitution provided that they should become free; yet it was held that, as the Constitution was framed and adopted under a manifest misapprehension of the preëxisting laws, it should not be so construed as to subject the children of registered servants to the term of service contemplated in the Constitution; and this, upon the ground that the provision in the Constitution was designed to favor the children of registered and indentured servants, and that it should not be construed so as to prove prejudicial to them. The court said, " it was intended by the framers of the Constitution as a limitation on

the supposed preëxisting right of the master to the service of the children of registered servants for a greater period of time, and designed as an exception in favor of such children, founded, it is true, on the mistaken supposition that, under the territorial laws, they had been subjected to a greater period of service; and not as creating a liability to service, and rendering a class of persons, evidently free at their birth, the subjects of a laborious and extended period of servitude. It is most manifest, that this proviso was framed under such a view, and intended as a mere limitation on the imagined right of the master to the service of the children." It must be remembered, that it had already been decided, in the case of Phebe *v.* Jay, (Breese, 207,) that it was competent for the State Constitution to reduce freemen to a state of slavery; * so that it was as competent for the convention to make slaves of the children of registered as of indentured parents; and that the only question before the court was one of construction, and not of power. The words of the Constitution under consideration were: " The children hereafter born of such persons, (indentured or registered servants,) negroes or mulattoes, shall become free, — the males at the age of twenty-one years, and the females at the age of eighteen years;" and it was held that this did not make them slaves, although it was competent for the Constitution to make them so, and although it was the manifest expectation, not to say intention, of the convention, that the children of both classes of persons should be equally bound to serve the prescribed time. But this expression of intention was made under the misapprehension of the existing rights of the subjects of the provision, and with the design of relieving them from a supposed existing burden, and not with the design of inflicting a servitude upon those who were already free.

So, in the case at the bar, the legislature adopted the fifteenth section of the dower act, evidently under a misapprehension of the extent of the rights already guaranteed by law to the widow, and with the design of extending and not abridging them. This

* I have, on former occasions, declined assenting to this principle, and am not now to be understood as approving it.

is as manifest from the reading of the act as if it had stated in a preamble that, in the opinion of the legislature, the rights of widows in certain cases were too restricted; and that it was just and proper, in such cases, that, thereafter, the rights of the widow should be so extended as to allow her to elect to take, instead of her dower, the one half of the real estate of which her husband died seized, and which should remain after the payment of the debts, and that she should have a reasonable time after the settlement of the estate to make such election; and, in that case, the body of the law would as clearly indicate, as it now does, the intention of the legislature, to prescribe the limits of the widow's rights. It is true, that such a preamble might be resorted to, to aid in the construction of the law; but it is only for the purpose of ascertaining what considerations moved the legislature in its passage; and when those considerations can as well be ascertained from the body of the law, they are entitled to the same influence in its construction as if they had been stated in a preamble. In construing a statute, we must consider the mischief designed to be repressed, and the remedy intended to be given, and should so construe it as to repress the mischief and to advance the remedy, and not so as to increase the mischief and retard the remedy.

In the case of the servants already referred to, while the convention, supposing they were bound to serve their masters from twenty-eight to thirty years, thought best, instead of abolishing the service altogether, to cut it down to eighteen or twenty-one years; it by no means follows that, had the convention been aware of the fact, that they were bound to no service, they would have imposed one, to the same extent to which they were willing to allow a supposed existing service to continue. So, in the case of the law fixing the price of wine, — supposing that the law would expire sooner, parliament was willing, when called upon to act affirmatively, to extend it to the end of the parliament, yet it did not follow that, had the lawmakers observed that the law was already perpetual, they would have been willing to limit its operation to the same term to which they affirmatively extended it. And the same remark may be made in the case of the revenue granted out of strong liquors. So, in this

62*

case, while the legislature, feeling called upon to extend the rights of the widow, were only willing to go so far as to allow her to take, in lieu of dower, a certain portion of the husband's estate absolutely; it by no means follows that, had they been aware that, by the existing laws, she had even greater rights than this proposed to be secured, they would have been willing to abridge those preëxisting rights to the measure prescribed in the law which did pass under a misapprehension of those previous rights. The legislature will often refuse to take away existing rights, which they would not be willing to grant if they did not exist. The legislature may, no doubt, take away rights of the existence of which they are not aware; as if, in this case, they had said, the widow shall have so much, and no more; but there would have been a manifest intention either to abridge or to extend, as the case might be, and to fix the rule of right irrespective of previous provisions. We have an example of this in the 9th section of the dower act, which provides that, where a *jointure* has been provided for a wife, in lieu of dower, she may elect which she will take, "but she shall not be entitled to both." But here, the legislature have granted the widow certain rights which she already possessed, but have not said she shall have no others. As in the case of the children of the registered servants, and the other cases referred to, the design of the law was to confer a benefit; and it should not be so construed as to work an injury, there being no restrictive words cutting off other rights than those granted.

But, should we take a different view of this subject, and find an intentional conflict between these two sections, found in different chapters, the rule of construction prescribed by the Revised Statutes would lead to the same practical result, admitting, as insisted by the defendants, that no election was made. The 23d section of the 90th chapter provides as follows: "If the provisions of different chapters of the Revised Statutes conflict with or contravene each other, the provisions of each chapter shall prevail as to all matters and questions growing out of the subject-matter of such chapter." The 109th chapter of Revised Statutes, entitled "Wills," embraces the whole subject of the disposition of estates of deceased persons, whether testate

or intestate, except only the subject of dower, which is provided for in the 34th chapter, entitled "Dower," which treats of that subject alone, except where others are incidentally introduced as inseparably connected with dower.   The subject-matter of this suit is the inheritance, and not dower, and, therefore pre- sents a question growing out of the subject-matter of chapter 109; and by the rule, as above quoted, we are required to adopt the rule of right, which is given in the 46th section of that chapter, and are not allowed to adopt a rule to be found in another chapter, treating of another subject-matter.   By the rule prescribed in the 46th section, the widow inherited the one half of the real and the whole of the personal estate, with the right of dower in the remainder of the real estate.   When called upon to determine a question of inheritance, it is plainly written that it shall be determined by this rule.   Were this suit for dower, then, according to the above rule, we should look to the provisions of the 34th chapter for the governing rule; and, by the 15th section of which, she would be entitled to dower without any election whatever, which would accord with the provisions of the 46th section of the 109th chapter, where the subject of dower is incidentally mentioned, merely for the pur- pose of declaring, that the taking of the rights previously granted in that section should not deprive the widow of the right of dower.   In the absence of an election, which the de- fendants insist has not been made in this case, the widow is entitled to dower, which it is said shall govern when a question as to the right of dower is depending; and which would also be the rule under the statute of wills.   Under the same circum- stances, is she entitled to her inheritance by the statute of wills, which is required to govern when a question of inheritance is involved.   So we see, that by adopting the rule of construction given in the Revised Statutes, we arrive at the same result, and leave the 15th section of the dower act without any practical operation different from that given in the other law.

But we choose to place our decision on what we consider higher and more substantial grounds, and hold that, as the last act was passed under a misapprehension of the rights of the widow, already secured under existing laws, and with the inten-

tion of conferring more rights than were supposed already to exist, the legislature have not, without intending so to do, repealed or restricted the operation of the former law. The old law remains unaffected by the new, and according to its provisions the rights of the parties must be enforced. The widow inherited one half of the real'and the whole of the personal estate of her deceased husband, which remained after the payment of his debts, as her individual and absolute estate; and as such, upon her decease, it descended to the complainants, who are her only heirs at law, according to the provision of our statute regulating descents. Such was the decree of the Circuit Court, which must be affirmed. *Judgment affirmed.*

Treat, C. J., dissented.