## DANIEL M. WALL v. THE STATE.

If the defendant, in a criminal case, would claim a continuance as a right under the Constitution, to enable him to have process to compel the attendance of witnesses in his behalf, he must apply immediately, or show good cause why he failed to do so. (Of course the circumstances under which the defendant is forced to trial, will be taken into consideration on the question whether there is any cause to believe he did not have a fair trial.)

Mere threats, not accompanied by some act, done at the time of the homicide, which manifested an intention to execute such threats, are no extenuation of the crime of murder.

A first application for a continuance, on the ground of the absence of a witness, should exclude the conclusion that there are other witnesses whose testimony might have been obtained, by whom the same facts could be proved.

A defendant in a criminal case is not entitled to demand a postponement of the trial, as a matter of legal right, in order to afford him an opportunity of finding persons who would join him in an affidavit to obtain a change of venue.

The case of Gehrke v. The State, 13 Tex R. 568, and White v. The State, 16 Tex. R. 206, in which this Court decided that an indictment for murder, in

Wall v. The State.

the common law form, charging the offence to have been committed feloni-
ously, wilfully and of his malice aforethought, was sufficient to sustain a
conviction of murder in the first degree, reviewed and approved.

The Statute which was in force when the killing in this case and the cases of
Gehrke v. The State, and White v. The State took place, provided " that all
" murder committed by poison, starving, torture or other premeditated and
" deliberate killing, or committed in the perpetration or in the attempt at the
" perpetration of arson, rape, robbery or burglary, is murder in the first de-
" gree ; and all murder not of the first degree is of the second degree."

The general principle is admitted, that if the law which created the offence, is
repealed, after the repealing law takes effect, no further proceeding can be
taken under the repealed law to enforce the punishment.

The principle is held to apply as well to the proceeding upon the appeal, in the
appellate Court, as to the Court having original cognizance of the offence ;
and as well where the appeal took effect after the removal of the cause to
the appellate Court, as before.

But the general principle is modified by the Penal Code, which, in this instance,
is the repealing law.

The Penal Code provides that no offence committed prior to the taking effect
thereof, shall be affected by the repeal therein, of existing laws, but punish-
ment shall take place as if the laws repealed had remained in force ; except
that where the punishment shall have been mitigated by the code, its provi-
sions shall apply to and control any judgment to be pronounced after its
taking effect, for any offence theretofore committed, unless the defendant
elect the former punishment.

Murder, under the previous Statute, was divided into murder in the first de-
gree and murder in the second degree, as stated in the sixth paragraph of
this synopsis, the former punishable with death, the latter with confinement
to hard labor in the penitentiary for a term of years, not less than three nor
more than fifteen, to be assessed by the jury ; under the Penal Code, murder
is punished according to the degree of atrocity, or the circumstances of ex-
tenuation in each particular case, by death, solitary confinement in the peni-
tentiary for life, or confinement in the penitentiary to labor for a term of
years, not less than three nor more than fifteen, the jury to find the punish-
ment directly by their verdict : Held that the punishment for murder was
not mitigated by the latter law.

Appeal from Liberty. Tried below before the Hon. Peter
W. Gray.

Indictment returned into Court May 30th, 1856, against
Daniel M. Wall, appellant, for murder of Middleton A. Praytor.
The indictment was in the common law form, not using the

words "premeditated and deliberate." The killing had taken place after dinner of the 29th May, the day before the indictment was found ; and the defendant had been pursued and immediately arrested. A copy of the indictment was delivered to the defendant by the Sheriff, the same day on which it was found. June 2nd, special venire summoned, and copy and list of jurors delivered to defendant ; same day, it appearing that defendant was unable to employ counsel, at his request two members of the Bar were appointed to defend him. June 3rd, the case was called for trial, and defendant moved the Court to grant a continuance, upon his affidavit as follows : In this case the defendant comes and makes oath that he cannot go safely to trial for want of the testimony of James T. Kelly, by whom he expects to prove that M. A. Praytor made threats against the life of this affiant ; that said Kelly has not been subpœned, because the indictment has been so recently found that affiant has been unable to have it done. Affiant also moves for a continuance in order to give him an opportunity to find those who will join with him in an oath for a change of venue, as he believes that he cannot have justice done him in Liberty county, and he has had so short a time since the finding of the indictment, and, owing to his confinement in prison, he has not had an opportunity to make inquiry and to find and converse with those who are friendly to him, and upon whose opinion he can rely. Affiant also believes that, by delaying the trial, he can find testimony that will be of benefit to him on the trial of this cause—Sworn to &c.

Motion for continuance overruled ; trial same day ; evidence as follows :

C. Devore, examined on the part of the State, says : On the 29th of May, Wall came round the corner of Gedry's house on the porch of which witness was lying. Wall asked witness where Praytor was ; witness pointed Praytor out to Wall ; Praytor was standing near a house some —— yards distant ; Wall said to witness, he wanted Praytor to pay him, Wall,

some money he, Praytor, owed Wall ; Wall then walked up to where Praytor stood leaning up against the house holding his horse ; witness thinks Wall shook hands with Praytor ; Wall's body was between witness and Praytor, with his, (Wall's,) back to witness, and from the position and motions of Wall's body, witness thought he was shaking hands ; Wall stepped back a step or two and made a thrust, as with a knife; witness did not see a knife in Wall's hands at the time ; Wall then started off, and F. Rhoads exclaimed to witness, "Let's catch the damned rascal," or "damned villain ;" witness saw Praytor at the time Wall made the thrust, place his hand to his side and exclaim, "I am killed," "I am killed," several times ; witness, together with F. Rhoads and others pursued Wall, who ran off ; but at the time witness came up with Wall he was in the custody of the Sheriff ; witness saw Praytor afterwards immediately at Gedry's house ; Praytor had a wound in the abdomen, below the short ribs on the left side having the appearance of being made with a knife ; Praytor was vomiting blood and very pale ; Praytor was struck a short time after dinner on the 29th of May, 1856, and died about dusk on the same day, as witness thinks in consequence of the wound ; it occurred at Gedry's in the town and county of Liberty.

Cross-examined : The time Wall called at Gedry's was after dinner ; witness saw Wall when he met Praytor ; the time between the meeting of Wall with Praytor and the thrust, was very short, probably ten seconds.

B. F. Rhoads, witness for the State, says : On the 29th of May witness was in company with Praytor and Smith at a little store ; Praytor was holding his horse, standing outside of the store door ; saw Wall coming ; Wall walked up to where Rhoads was and shook hands with him ; Wall walked to Praytor and said, "You are here, are you ?" Praytor said "Yes ;" they shook hands, and Wall stepped back, and after stepping back, Wall remarked, "I should like you pay me what you

owe me ;" Praytor said, "I do not owe you ;" Wall said "You owe me (the amount witness did not recollect, but between twenty and thirty dollars) dollars ;" Praytor said, "It is a damned lie," or "you are a damned liar ;" Wall then struck Praytor with the knife exhibited to the jury ; it is what is called a hack knife ; as Wall drew the knife back, Praytor exclaimed, "I am killed," or "I am dead," several times ; Wall immediately fled ; witness got a horse and gun after some little delay, and pursued and overtook Wall in about a half mile ; witness presented his gun and told Wall to stand, who replied that he gave himself up ; by this time the Sheriff arrived and took Wall into custody ; Wall had with him the same knife, (in the scabbard,) with which he struck Praytor ; the fight occurred about dinner time, on the 29th of May, in the county of Liberty, and Praytor died the same day in the evening ; the knife was exhibited to the jury, and identified by the witness as being the same knife with which the blow was struck ; the knife was what is usually called a hack knife, and about twelve inches in the blade ; Wall and Praytor were between four and seven feet apart when Praytor called Wall a damned liar ; Wall advanced to Praytor in striking the blow.

Cross-examined : Wall met witness and shook hands with him in his usual manner ; there was no excitement in Wall, he appearing as usual ; Wall accosted Praytor in a mild and friendly manner, as it appeared to witness ; at the time Praytor called Wall a damned liar, he, Praytor, drew himself up in an erect attitude ; witness could not say Praytor advanced towards Wall ; Wall was standing between Praytor and witness.

Wiley Smith examined for the State : witness was standing talking with Rhoads when Wall (who was a stranger to witness) came up and spoke to Rhoads. Wall then went to Praytor and asked him (Praytor) to pay him (Wall) what he owed him ; Praytor replied he "did not owe Wall anything," Wall

said that he owed him something between twenty and thirty dollars, witness did not recollect the exact amount; Praytor told Wall, " it was a damned lie," or " he was a damned liar ;" witness was standing with his back to the parties until he heard the damned lie given; witness then turned around and saw Wall stoop and make a thrust with a knife at Praytor; Praytor immediately clapped his hand to his abdomen and exclaim, " I am killed, I am killed," several times; witness ran up and took hold of Praytor and aided and took him together to Gedry's house, which was about a hundred yards distant and laid him upon the porch; Praytor then commenced vomiting, and vomited up blood and the contents of his stomach; witness saw blood upon Praytor's clothing on the abdomen when he took hold of him; when Wall drew the knife back he wiped it, witness thinks, on his coat sleeve, and put it back in its scabbard; Wall immediately fled in direction of the river, and was pursued by Rhoads, Devore, and others; witness recognized the prisoner at the bar as the same man that struck Praytor; Praytor was struck between twelve and three o'clock on the 29th of May, and died about dusk on the same day.

Cross-examined : There was no appearance of excitement in Wall, or any thing unusual in the language of the parties, or the manner in which they met, until the damned lie was given by Praytor; up to that time their language and manner were such as might be used between friends; witness had no personal acquaintance with the deceased, but was told his name was Praytor; Praytor was a large, athletic man.

A. B. Trowell, examined by the State : Witness is Clerk of the District Court of Liberty county; witness states that at the present Term of the Court, an indictment was found against Wall for stealing a cow, the property of Stephen Green, Reason Green's son, with Praytor's name indorsed on the indictment (being the only one) as the witness upon whose testimony the indictment was found; the indictment was exhibited and

shown to the jury; on the morning of the 29th, Wall was arrested on said charge, brought into open Court and recognized.

Wm. Young, examined by the State : Witness lived with Wall, as also Praytor lived with Wall at Branch & Green's mill in last winter ; Wall got witness to make him a knife (the same knife which had been exhibited to the jury); Wall said he wanted it for the purpose of cutting vines and bushes in going through the woods and of killing beeves, there being wild cattle in that neighborhood ; that some weeks after that, Wall and Praytor had a falling out about this cow business ; (Wall having ground up and put a handle on his knife before that time ;) one day at the mill, Wall and Praytor had a falling out ; both drew arms ; one had a hatchet and the other went after a gun ; one day at the widow Lane's about the last of December, Wall said that he (witness) had made him (Wall) a knife with which he expected to kill Reason Green, or Praytor or both ; Wall said he was going over to Houston to sell his wagon and tools, then go where Praytor came from for the purpose of finding out Praytor's character, and come back to the spring Court at Liberty ; that he did not intend that Praytor should ever testify against him in the cow case ; he made these statements at other times and places, and said on one occasion that he expected to cut out Praytor's guts with the knife witness had made him ; shortly after these conversations Wall left for Houston ; witness saw him again here at this Term of the Court.

Cross-examined : Witness communicated the conversations he had with Wall to Reason Green and Praytor ; that Praytor stated that he, Praytor, was an honest, upright man, and that he did not believe that a damned rascal would kill him ; Mr. Kelly was the only person that was present at the conversations mentioned in witness' direct examination between Wall and witness.

Dr. N. D. Brashear, examined by the State : Witness was

called as a physician to see Praytor after he was stabbed; examined the wound which was in the abdomen on the left side below the short ribs, ranging towards the stomach, which witness believes must have been cut; witness thinks the wound from its appearance was made with the thrust of a knife; the wound witness thinks was the cause of the death of Praytor.

The following named persons were introduced by the defendant, as witnesses on his behalf, to-wit: Reason Green, James H. Johnston, F. H. Green, G. West and Howell Holliman and James Robinson, each of whom stated that they had known William Young off and on for about a year; that they could not say that they knew what was the reputation of Wm. Young among those acquainted with him for truth and veracity; that Young had lived in the same neighborhood with themselves; that Young would "run on" and tell "long yarns" some times, and talk at random, but could not say that in a grave matter, or a matter of importance, he would tell a falsehood; never heard him testify in any case before, and could not say that he would swear falsely or tell a falsehood about a matter of moment or importance.

Charge of the Court, without request, as follows:

The prisoner is indicted for the murder of Middleton A. Praytor, by stabbing with a knife, in Liberty county, on the 29th of May, 1856. He has pleaded "not guilty," and you have been sworn to try the issue, "according to the law and the evidence." Of the credibility of the witnesses in testifying to facts, and of the weight to be given to the evidence, in considering your verdict, you are the exclusive judges. The law of the case, as applicable to the facts, it is the duty of the Court to explain to you, and it is your duty to observe and act on the law as given you in charge, and to render your verdict on the facts as applied by you to the law.

Murder is defined to be the unlawful killing by a person of sound memory and discretion (that is, of sane mind) any reasonable creature, feloniously, wilfully, and of malice afore-

thought. Our law divides murder into two degrees, and provides that if it is "a deliberate and premeditated killing," it is murder in the first degree, but if done with malice and not deliberately and premeditatedly, then it is in the second degree.

Your first inquiry is, did the accused kill Middleton A. Praytor in Liberty county? Upon this you will decide on the facts. If you find that he did not, then you will find him "not guilty," without further inquiry; but if you find that he did, then you will proceed to inquire, second, was it a lawful killing? When the fact of killing a man is proved, the law presumes that it was done intentionally, or with a design to kill, and therefore with malice. The burden of proving that it was done lawfully, or with legal excuse or alleviation, so as to justify or reduce the crime, is cast upon the accused. Proof of previous accusations of crime by the deceased, is not legal excuse or alleviation. It is the nature of the provocation, and not the effect of it upon the mind that the law regards; and no affronts or insults by words or gestures, however false and malicious, will be legal excuse or alleviation. Words or gestures do not justify or excuse blows; and certainly not the killing of a man. If you find, then, that there was no lawful excuse or alleviation for the killing, then the law presumes and holds it to be murder in the second degree; that is, that it was done of malice, but it does not presume deliberation and premeditation. In the absence of testimony tending to prove these requisites, your verdict would then be murder in the second degree. But in this case your next inquiry would be, third, was the killing done deliberately and premeditatedly, or with malice aforethought? The burden of proving that it was, rested on the prosecution, and you are to decide whether it has been proved. To make it deliberate, the accused must have reflected whether he would kill or not, and to make it premeditated, he must have determined before hand to kill, as the result of his reflection; but the law does not and cannot define any precise time as necessary for deliberation and pre-

meditation. The operation of the mind in premeditation and deliberation may take place in the shortest interval, even the moment before the act, as well as months before. It is only necessary that the accused reflected and determined to kill, and that he did not do it under sudden excitement of his passions, inflamed by sufficient provocations at the moment, or just before the act, so that his reason was overcome. Like every other fact, it may be proved by any circumstances which satisfy your minds, to the exclusion of reasonable doubt. The deliberate intention of the accused determines the degree of the offence, and that intention must be determined by the acts of the party. The deliberate intention of the mind is manifested by external circumstances indicating the inward motive. Such circumstances as former quarrels or grudges, or previous threats to injure or kill ; seeking a party with whom there is cause of quarrel, armed with a deadly weapon ; coming on a man unawares ; using a deadly weapon on an unarmed man, and such like, are evidences indicating the inward intention, and the degree of deliberation. If then, from the evidence, you believe beyond a reasonable doubt, that the accused killed Praytor without lawful excuse or alleviation, and that it was done with deliberation and premeditation ; that is, if the accused had time to think or reflect, and did seek the deceased with the formed design or intention to kill him, in revenge for previous wrongs, or to prevent his appearing as a witness against him, or to punish him for it, or for any other reason or motive, and did in pursuance of his design, kill him then it is murder in the first degree, and you will so find by your verdict ; but if you are not satisfied beyond a reasonable doubt, that it was so done, then you will find guilty of murder in the second degree.

To find him guilty at all, you must be satisfied of his guilt on the evidence and law given you in charge beyond a reasonable doubt, by which expression, wherever it is used, is meant not a possible doubt, nor a fancied doubt, nor a doubt arising

on what may be supposed to have been the case, but such a doubt as naturally arises from the facts in the minds of men of common sense and good judgment.

The defendant's counsel asked the Court to instruct the jury as follows :

1. That under the indictment as framed in this case, they cannot find the defendant guilty of murder in the first degree.

2. That if, from the evidence, there should be a reasonable doubt, such as would arise from the facts, in the minds of men of common sense and good judgment in regard to the fact of premeditation and deliberation in the killing, then the defendant is entitled to the benefit of that doubt in lessening the offence by limiting the inquiry to his guilt of murder in the second degree. 

The first was refused ; the second was given. Verdict of guilty of murder in the first degree. Motion for new trial overruled. Motion in arrest of judgment, on the ground that the indictment was for murder in the second degree only ; overruled. Judgment ; appeal by defendant. Assignment of errors as follows :

1st. Because the Court erred in overruling the defendant's application for a continuance.

2d. Because the Court erred in refusing to give charge numbered 1, requested to be given by the defendant.

3d. Because the Court erred in its charge to the jury.

4th. Because the jury found contrary to the law and evidence.

5th. Because the Court erred in overruling defendant's application for a new trial.

6th. Because the Court erred in overruling defendant's motion in arrest of judgment.


*B. C. Franklin,* for appellant. (We find no brief, on either side, in this case. REPS.)

Wall    v.   The   State.

*Attorney   General*, for appellee.

WHEELER, J.  The application for a continuance manifestly
showed no sufficient legal ground to entitle the defendant to a
postponement of the trial.  It does not appear that he had so
much as asked a subpœna for the witness.  If he had done
this, after the service upon him of the copy of the indictment,
for aught that appears, the attendance of the witness might
have been procured.  But if the witness had been present, his
testimony would have been of no avail to the defendant.  It
was proposed to prove by him mere threats of the deceased;
which, if proved, would have been no extenuation of the crime.
Moreover, the affiant did not state that he knew of no other
witness by whom he could prove the same facts.  It is scarcely
necessary to say, he was not entitled to demand a postpone-
ment of the trial, as a matter of legal right, in order to afford
him an opportunity of seeing if he could not find other evi-
dence, or persons who would join him in an affidavit to obtain
a change of venue.  There is no error in the ruling of the
Court refusing a continuance.

The sufficiency of the indictment, to warrant a conviction of
murder in the first degree, under the Statute, is not an open
question.  In Gehrke v. The State (13 Tex. R.) this Court de-
cided that an indictment for murder, in the common law form,
charging the offence to have been committed feloniously, wil-
fully and of malice aforethought, was sufficient to sustain a
conviction of murder in the first degree.  The question was
again earnestly pressed upon the consideration of the Court
in the case of White v. The State. (16 Tex. R. 206.)  But the
first opinion was adhered to.  We might content ourselves
with a reference to these decisions, as having put the question
at rest in this Court.  But as the objection is again urged, it
will not be out of place to refer to a few decisions in our sister
States, which show, that what is the settled law of this

Court, is also the well settled doctrine of other Courts, upon Statutes similar to our own, and that it is rightly settled upon principle.

The Statute of Tennessee distinguishes the degrees of murder, and defines murder in the first degree, in terms nearly identical with those employed in the Statute of this State, as any " wilful, deliberate, malicious and premeditated killing." (Laws of Tenn. p. 316, Act of 1829, Sec. 3, Whart. Am. Cr. L. 418.) And in Mitchell v. The State, (5 Yerger,) the Supreme Court of that State held an indictment for murder in the common law form, sufficient to sustain a conviction of murder in the first degree, under the Statute. The question was again raised in the later case of Hines v. The State, (8 Humph. R. 597,) and it was then said by Judge Green, delivering the opinion of the Court, that the construction which was given to the Statute in Mitchell's case in 5 Yerger, had met with such general approval by the profession, that the decision had never been questioned in that Court, until in the case then before them ; and that they regard it as the settled law of the Court, not now open for debate.

The Statute Law of Pennsylvania contains a like definition of the degrees of murder, (Whart. Am. Cr. L. 355,) and it is there held, that it is not necessary that the indictment should so describe the offence as to show whether it be murder of the first or second degree ; and that an indictment for murder in the common law form is sufficient to support a conviction of murder, of either degree. The reasoning of Chief Justice Tilghman, in White v. The Commonwealth, (6 Binney, 179,) is equally applicable to our Statute, and shows, very satisfactorily, that there is nothing in the Statute which requires any change in the form of the indictment, but that it is plain none was contemplated. The general principle is recognized, that where a Statute creates an offence the indictment must pursue, the statutory definition in charging the offence, and must charge it to have been done against the form of the Statute. But

where the Statute only inflicts a penalty upon that which was
an offence before, it need not be so laid, because in truth the
offence does not consist in a violation of the Statute.   The Act
does not create the crime of murder ; nor, so far as concerns
murder in the first degree, does it alter the punishment, which
was always death.   All that it does is to define the different
degrees of the crime, and regulate the punishment accordingly.
It is plainly taken for granted by the Act itself, that it would
not always appear on the face of the indictment, of what de-
gree the murder was, because the jury are to ascertain the de-
gree by their verdict.   But if indictments were to be so drawn
as to show that the murder was of the first or second degree,
all that the jury need do, would be to find the prisoner guilty
in the manner and form as he stands indicted.   (Id. 182, 183.)

The revised Statutes of New York contained a definition or
description of the crime of murder, under three classes of
cases ; the first being " when perpetrated from a premeditated
design to effect the death of the person killed, or of any hu-
man being."   And in The People v. Enoch, the Supreme Court
held an indictment charging the offence in the common law
form, instead of charging it to have been perpetrated from a
" premeditated design to effect the death of the person killed,"
sufficient.   The Court said, " We may concede that this indict-
" ment must be sustained, if at all, by charging the offence de-
" fined in the first subdivision, (above quoted) because if proof
" of express malice was not admissible under it, for that pur-
" pose, proof of implied malice would not be.   We may also
" concede the general principle applicable to indictments
" founded upon Statutes, that it is necessary to set forth all the
" facts and circumstances which constitute the offence as de-
" fined in the act, so as to bring the offender clearly within the
" statutable offence."   The same principle applies where an
offence at Common Law has been raised by Statute, by increas-
ing the punishment ; as where the benefit of clergy has been
taken away, or a misdemeanor has been raised to a felony.

But the application of this principle to the case is not admitted ; for the Statute has not altered the Common Law. The offence of murder, as defined in the Statute, was such before the Statute. There is no new offence created by the Statute, nor a new punishment annexed to an old offence. The case, therefore, does not fall within the rule, nor the reason of the rule, supposed to be violated by the form of the indictment. The Court conclude, " The rule that the indictment should bring " the offence within the words of the Statute declaring it, is ap- " plicable only, in strict terms, to cases where the offence is cre- " ated by Statute, or where the punishment has been increased, " and the pleader seeks to bring the prisoner within the enhanced " punishment. It is a clear proposition, that an approved form " of indictment at Common Law, is good for the same offence, " though declared by legislative enactment." The case was taken by writ of error to the Court of Errors, and the judgment of the Supreme Court affirmed by the unanimous opinion of the Court. (13 Wend. R. 159, 178.) Other authorities might be cited. But these will suffice to place it beyond question, that the decision of this Court in Gehrke's case, and White's, settled the law rightly upon principle and authority.

There is and can be no question of the sufficiency of the evidence to warrant the finding of the jury ; nor is there any question of the correctness of the charge of the Court. There is manifestly no error in the judgment.

But it is now insisted that this Court cannot affirm the judgment, by reason of the repeal of the law defining the degrees of murder, and the abolition of the Common Law, effected by the Penal Code, (Art. 609, 612, 612 a) which went into force on the first of the present month, since this appeal was pending. The general principle is admitted, that if the law which created the offence is repealed, after the repealing act takes effect, no further proceeding can be taken under the repealed law to enforce the punishment. The general principle which has been invoked, qualified by the condition that the repealing

Wall v. The State.

Statute substitutes no other penalty, and does not otherwise provide, is enacted in the Code. (Art. 15.) The principle is held to apply as well to the proceeding upon appeal, in the appellate Court, as to the Court having original cognizance of the offence ; and as well where the repeal took effect after the removal of cause to the appellate Court, as before. (United States v. The Schooner Peggy, 1 Cranch, 37, 40.) But, admitting the general principle in all its force, its application to the present case is expressly provided against and prevented by the repealing Act. The 14th article of the Code, to which we are referred, at the same time that it declares, that when the penalty for an offence prescribed by one law, is altered by a subsequent law, the penalty of the latter shall not be inflicted for a breach of the former ; also declares that "in every such "case the offender shall be tried under the law in force when "the offence was committed, and if convicted, punished under "that law ; except that when by the provision of the second "law, the punishment of the offence is ameliorated, the defend-"ant shall be punished under such last enactment, unless he "elect to receive the penalty prescribed by the law in force "when the offence was committed." Again, Article 18 declares "that no offence committed prior to the taking effect of this "Code shall be affected by the repeal therein of existing laws ; "but punishment shall take place as if the laws repealed had re-"mained in force ; except that when the punishment shall have "been mitigated by the Code, its provisions shall apply to and "control any judgment to be pronounced after its taking effect, "for any offence theretofore committed ; unless the defendant "elect the former punishment." The only question, then, for the Court to inquire of, is, whether the punishment for the offence of murder has been ameliorated, or mitigated by the provisions of the Code. And it is clear that it has not. The punishment is, as heretofore, by death, or confinement in the penitentiary, "according to the degree of atrocity, or the circumstances of extenuation in each particular case." It may be

death ; or solitary confinement in the penitentiary for life ; or confinement in the penitentiary to labor, for a term of years not less than three, nor more than fifteen. (Penal Code, Art. 612 a.) It could not be more or less under the former law. It cannot, therefore, be said that the punishment has been ameliorated by the Code. The only alteration in the punishment, effected by the Code, is, that it prescribes as an intermediate punishment between death and confinement in the penitentiary for the longest period under the former law—i. e. fifteen years —(Hart. Dig. Art. 2517,)—solitary confinement for life. But that is not substituted in the place of either death or confinement in the penitentiary for a term of years. It is provided to give the jury more ample scope to apportion the punishment according to the nature and heinousness of the offence ; by a just estimate of which it is made their duty to regulate the punishment from that of death to confinement in the penitentiary to labor, for a term of not less than three years. (Penal Code, Art. 609, 612.) Whether the punishment shall be death or the milder punishment, is still made to depend on the " degree of atrocity, or the circumstances of extenuation in each particular case ;" preserving the same extremes as the former law. There is, therefore, no abatement or mitigation of the punishment. The object of the former law, in defining the degree of murder, was the same as the present ; that is, as the Code declares, to " regulate the punishment according to a just estimate of the heinousness of the offence." By that law the jury found the degree by their verdict, and the law annexed the penalty ; by the present law, the jury are not to find the degree expressly, but only as their verdict shall manifest their estimate of the heinousness of the offence by the punishment imposed. What the law required the Court to pronounce upon the finding of the jury, the jury are now to declare by their verdict. But in either case, the jury must decide upon the degree of guilt, the punishment to be regulated according to their estimate of it. They formerly found the degree ; they

are now to find the punishment ; and it is but a different mode of arriving at the same result. The Code therefore can in no sense be said to ameliorate or mitigate the punishment. That implies that the penalty is reduced, or in fact, taken away, a diminution of the punishment, which the provisions of the Code do not propose or effect.

Finally, the Code of Criminal Procedure (Tit. 5, Sec. 2) declares that "no action, plea, prosecution, or proceeding in any " criminal case now pending, or which may be pending when " this Act takes effect, shall be effected by the repeal of the laws " under which it originated, but the same shall proceed in all " respects as if no such repeal had taken place ; except that all " proceedings had after the time this Act takes effect shall be " conducted according to its provisions."

There is nothing in the provisions of the Code to prevent the Court from proceeding to judgment in cases similarly situated to the present, as though it had not been passed ; and it manifestly was not the intention or within the contemplation of the Legislature, that anything therein contained should have that effect or relieve the Court from the duty of affirming a judgment of conviction, which had been rightly rendered according to law. We are of opinion therefore that the judgment be affirmed.

Judgment affirmed.