[Civil No. 2623. Filed March 28, 1927.]

[254 Pac. 477.]

In the Matter of the Application of WILLIAM FALTIN for a Writ of Habeas Corpus.

Mr. John W. Ray and Mr. Chas. H. Young, for Petitioner.

Mr. John W. Murphy, Attorney General, Opposing Application of Petitioner.

LOCKWOOD, J. — William Faltin, hereinafter called petitioner, made application for a writ of *habeas corpus*, alleging that he was unlawfully imprisoned by the superintendent of the state prison. The writ was granted and, contrary to our usual practice, issued by and made returnable before this court sitting *in banc*, for the reason that it showed on its face it involved questions the correct and speedy determination of which is of importance to the state as a whole, as well as to the petitioner as an individual. The facts necessary for the determination of the matter are not disputed, and the issue is solely one of law.

On October 9th, 1912, an information was filed against petitioner in the superior court of Maricopa county, charging that he had committed the crime of murder on or about the ninth day of September of that year. He was duly tried and convicted of murder in the first degree, and the penalty fixed by the jury at death. On the eighth day of February, 1913, the superior court of Maricopa county pronounced judgment on the verdict, sentencing him to be hanged upon the eighteenth day of April. An appeal was taken

to the Supreme Court of this state, and the judgment of the superior court was duly affirmed on the twenty-third day of September, 1915, and petitioner ordered to be executed upon the twenty-sixth day of November. For some reason he was not executed as provided by the last order, and on the third day of December he was brought before the superior court of Maricopa county and resentenced to be hanged upon the seventh day of January, 1916.

On the tenth day of December the county attorney of Pinal county, in which county the state prison is situated, filed in the superior court of Pinal county a petition setting up the conviction and the judgment and orders aforesaid, alleging that petitioner was insane, and asking that the question of his sanity be inquired into. A jury was impaneled to try such issue in accordance with the provisions of paragraphs 1141–1143, Penal Code of Arizona of 1913, which jury on the eighteenth day of December returned a verdict that he was insane. He was then committed to the State Asylum for the Insane, where he remained until the eighteenth day of August, 1917. On that day he was duly discharged by the superintendent of said hospital as being sane; the fact was certified to the Governor, and petitioner was returned to the state prison and to the custody of the superintendent thereof, where he has since remained in such custody by virtue of the various proceedings, orders, and certificates aforesaid.

At the time it was alleged petitioner had committed the crime of which he was convicted, and at all times thereafter until October 1st, 1913, the penalty for the crime of murder was governed by section 174, Penal Code of Arizona of 1901, which read as follows:

"Every person guilty of murder in the first degree shall suffer death or imprisonment in the territorial prison for life, at the discretion of the jury trying the

same, or, upon the plea of guilty, the court shall determine the same; and every person guilty of murder in the second degree is punishable by imprisonment in the territorial prison not less than ten years."

On the date last mentioned the new Penal Code went into effect. Section 173 thereof is identical in language with section 174, *supra,* except that the word "territorial" is changed to "state."

In 1909 the Twenty-Fifth Territorial Legislative Assembly passed chapter 28 of the Session Laws of that year, amending, among other things, certain sections of the Penal Code of 1901 so that when amended they read as follows:

"1027. If, after his delivery to the superintendent for execution, there is good reason to believe that a defendant, under judgment of death, has become insane, the superintendent must call such fact to the attention of the district attorney of the county in which the prison is situated whose duty it is to immediately file in the district court of such county a petition, stating the conviction and judgment and the fact that the defendant is believed to be insane, and asking that the question of his sanity be inquired into. Thereupon the court must at once cause to be summoned and impaneled from the regular jury list of the county, a jury of twelve persons to hear such inquiry.

"1028. The district attorney must attend the hearing and may produce witnesses before the jury, for which purpose he may issue process in the same manner as for witnesses to attend before the grand jury, and disobedience thereto may be punished in like manner as disobedience to process issued by the court.

"1029. The verdict of the jury must be entered upon the minutes, and thereupon the court must make and cause to be entered an order reciting the fact of such inquiry and the result thereof, and when it is found that the defendant is insane the order must direct that he be taken to the Territorial Asylum for the Insane, and there kept in safe confinement until his reason is restored.

"1030. If it is found that the defendant is sane, the superintendent must proceed to execute the judgment as specified in the warrant; if it is found that the defendant is insane, the superintendent must suspend the execution, and transmit a certified copy of the order mentioned in the last section to the Governor, and deliver the defendant, together with a certified copy of such order, to the medical superintendent of the Asylum named in such order. When the defendant recovers his reason the superintendent of such asylum must certify that fact to the Governor, who must thereupon issue to the superintendent his warrant, appointing a day for the execution of the judgment."

"1033. If for any reason a judgment of death has not been executed, and it remains in force, the court in which the conviction is had, on the application of the district attorney of the county in which the conviction is had, must order the defendant to be brought before it, or if he is at large, a warrant for his apprehension may be issued. Upon the defendant being brought before the court, it must inquire into the facts, and if no legal reason exists against the execution of the judgment, must make an order that the superintendent of the territorial prison, to whom the sheriff is directed to deliver the defendant, execute the judgment at a specified time. The superintendent must execute the judgment accordingly. From an order directing and fixing the time for the execution of a judgment, as herein provided, there is no appeal."

These provisions were carried over almost literally into the Penal Code of 1913.

In 1916, and while petitioner was in the State Asylum for the Insane as aforesaid, the people of Arizona adopted an initiative act, which reads as follows:

"Be it enacted by the people of the state of Arizona:

"Section 1. That paragraph 173, chapter I, title VIII, Penal Code, of the Revised Statutes of Arizona,

1913, be and the same is hereby amended so as to read as follows:

" '173. Every person guilty of murder in the first degree shall suffer imprisonment for life, and every person guilty of murder in the second degree shall be confined in the State Prison for not less than ten years. No person convicted of the crime of murder shall be recommended for pardon, commutation or parole by the board of pardons and paroles except upon newly discovered evidence establishing to the satisfaction of all the members of said board his or her innocence of the crime for which conviction was secured.'

"Sec. 2. All acts and parts of acts in conflict with this act are hereby repealed."

This act remained in force until the fifth day of December, 1918, when the people approved another initiative act which restored the death penalty to section 173, *supra,* by making it read as it had originally appeared in the Penal Code of 1913, and also included provisions almost identical in language with the portions of the act of 1909 above quoted, which had been in substance carried over into the Penal Code of 1913.

It is the contention of petitioner that the initiative act of 1916 above quoted, which abolished the death penalty for the crime of murder in the first degree, and in its second section repealed all laws in conflict therewith, was as a matter of law a legislative pardon for the offense whereof he had been convicted, and that he therefore is entitled to his full and unrestrained liberty in the same manner as though he had been pardoned by the Governor upon the recommendation of the board of pardons and paroles. The argument whereby he reaches this conclusion may be summarized as follows: Under the Constitution of the United States, article 1, section 10, and the Constitution of the state of Arizona, article 2, section 25, no *ex post facto* law may ever be enacted by the state of Arizona. The crime of which defendant was

convicted was committed in 1912. Any act passed subsequent to the commission of that crime and affecting the penalty thereof would be, so far as he is concerned, an *ex post facto* law. Since the statute under which he had been convicted was repealed in 1916, he cannot now be punished thereunder, for it is no longer the law. Since the initiative act of 1916, so far as he is concerned, is an *ex post facto* law, he may not be punished according to its provisions, much less those of 1918. As there is no law in effect under which he can be punished in any manner for the offense whereof he was convicted, he must be released.

Admittedly the initiative acts of 1916 and 1918 are *ex post facto* so far as he is concerned, and in support of his contention as to the statutes in force in 1912–13, he cites to us many cases, the substance of which may be summed up in the following quotation from *Higginbotham* v. *State,* 19 Fla. 557, in which the court said:

"It has been well settled by repeated decisions that if the law which created the offense is repealed, after the repealing law takes effect *no further proceeding can be taken under the law so repealed.*" (Italics ours.)

See, also, *State* v. *Brewer,* 22 La. Ann. 273; *State* v. *Williams,* 97 N. C. 455, 2 S. E. 55; *Cecil* v. *Bray,* 4 Ky. Law Rep. 367; *State* v. *Railroad,* 58 Tex. Civ. App. 528, 125 S. W. 53; *Wharton* v. *State,* 5 Coldw. (Tenn.) 1, 94 Am. Dec. 214; *Wall* v. *State,* 18 Tex. 697, 70 Am. Dec. 302; *Aaron* v. *State,* 40 Ala. 307.

The position of petitioner is supported in the main by the cases we have cited, and his argument would have much force were it not for the fact that precisely the same question of law, though on a different state of facts, has been before us and determined adversely to his contention in the case of *La Porte* v. *State,* 14 Ariz. 530, 132 Pac. 563. The opinion in that case

fits so well the issues involved here that we quote fully therefrom:

"The errors assigned are: (1) There is no law in existence under which judgment and sentence can be imposed. . . .

"Under the first assignment of error appellant invokes the well-recognized rule that the law defining a crime and establishing its punishment must be valid and subsisting, both at the time of the commission of the offense and at the time of the trial, and that its failure at either time operates as a pardon of the offense, and entitles the prisoner to a discharge. . . .

"But it is the contention of respondent that there is a general law in the Penal Code which operates as a saving clause, thereby preventing the new legislation from repealing the penalties as fixed by the Laws of 1901 and 1909.

"Sections 1310 and 1311 read as follows:

"'1310. When the penalty for an offense is prescribed by one law and altered by a subsequent law, the penalty of such second law shall not be inflicted for a breach of the law committed before the second shall have taken effect. In every such case the offender shall be tried under the law in force when the offense was committed, and, if convicted, punished under that law.

"'1311. When by the provisions of a repealing statute a new penalty is substituted for an offense punishable under the act repealed, such repealing statute shall not exempt from punishment a person who has offended against the repealed law while it was in force, but in such case the rule prescribed in the preceding section shall govern.'

"It seems to us that in these two sections a legislative purpose and intent to avoid and prevent repeals of statutes defining crimes and establishing punishments by new legislation are manifest.

"The history of legislation, as disclosed by numerous decisions of the courts upon the very question we are considering, shows that through the inattention, carelessness and inadvertence of the lawmaking body crimes and penalties have been abolished,

changed or modified after the commission of the offense and before trial in such material way as to effect many legislative pardons. To prevent such mistakes and miscarriages of justice many of the states have enacted general saving statutes. None of them have statutes more comprehensive or broader than ours.

"In *People* v. *McNulty,* 93 Cal. 427, 29 Pac. 61, the court said: 'But construing the new law as passed with the knowledge and in the light of the permanent saving clause existing in the general body of the law, it is clearly constitutional as to future crimes, while it leaves past offenses to be punished under the law as it was when the offenses were committed.

" 'It is quite clear that a general saving clause, if it be clothed in apt language to express the purpose, is as efficient as a special clause expressly inserted in a particular statute. This proposition is too plain to need the support of authorities, but there are authorities directly to the point. *People* v. *Quinn,* 18 Cal. 122; *United States* v. *Barr,* 4 Saw. 254 (Fed. Cas. No. 14,527) ; *Jordan* v. *State,* 38 Ga. 585; *Volmer* v. *State,* 34 Ark. 487; *Acree* v. *Commonwealth,* 13 Bush (Ky.), 353; *State* v. *Shaffer,* 21 Iowa 486; *State* v. *Ross,* 49 Mo. 416.' More recent decisions, and to the same effect, are: *In re Davis,* 6 Idaho 766, 59 Pac. 544; *State* v. *Smith,* 62 Minn. 540, 64 N. W. 1022; *Heath* v. *State,* 173 Ind. 296, 90 N. E. 310, 21 Ann. Cas. 1056.

"Appellant's contention that paragraphs 1310 and 1311, *supra,* are temporary in their nature, and were passed to preserve only the crimes and penalties of the Penal Code, does not appeal to us with any convincing force. The very language indicates that they were intended to be a part of the permanent, general laws.

"Nor do we think that sections 6 and 7, chapter 10, Laws of 1907, have the effect, as claimed by appellant, of abrogating the general saving statutes of the Penal Code. Indeed, it is apparent that chapter 46, Laws Regular Session of 1912, does repeal chapter 101, Laws of 1909, and takes from the court the discretion lodged with it in fixing the punishment, as provided

by paragraphs 174 and 635, of all offenses committed subsequent to its enactment as completely and fully as language can express it. Aided by the rules of construction as given in sections 6 and 7 above, its evident purpose of repealing and modifying the old law cannot be made plainer. The old law is abrogated, repealed and modified for future offenses, but preserved by the saving clause contained in the general body of the Penal Code in so far as the penalties to be inflicted for offenses committed under it are concerned as much as if the later act had contained a special saving clause.

"In this case the court sentenced appellant under the indeterminate sentence law of 1909, the law that was in force at the time of the commission of the offense, and rightly so."

The case of *People* v. *McNulty,* 93 Cal. 427, 26 Pac. 597, 29 Pac. 61, from which we quoted in the La Porte case, was affirmed by the Supreme Court of the United States in *McNulty* v. *People,* 149 U. S. 645, 37 L. Ed. 882, 13 Sup. Ct. Rep. 959 (see, also, Rose's U. S. Notes). The Supreme Court of Missouri, in a case involving a much broader repealing statute, held, on saving sections of their code no stronger in their provisions than ours, as we did in the La Porte case. *State* v. *Lewis,* 273 Mo. 518, 201 S. W. 80. Sections 1491 and 1492 of the Penal Code of 1913 are the same as sections 1310 and 1311 of the Penal Code of 1901, which are set forth in full in our quotation from the La Porte case above.

Counsel for petitioner in his oral argument recognized the doctrine of the La Porte case, but insisted that this case is not governed by the same principle. So far as we could understand his position, it is that the repealing clause of the initiative act of 1916 repealed not merely the provision governing the penalty for murder, but all provisions in regard to the method of enforcing that penalty, and further that it was undoubtedly the intention of the people, when the

act of 1916 was before them for consideration, that it should govern not merely future cases but homicides already committed. So far as his first contention is concerned, we think it cannot be sustained. The sections of the code regulating the general method of executing a death penalty were in no way affected by the initiative act of 1916. That act did not, as is commonly assumed, abolish the death penalty within the state of Arizona *in toto;* it merely did so, so far as the one crime of murder in the first degree was concerned leaving it in full force and effect under the provisions of section 33, Penal Code of 1913, for the crime of treason, and section 438, for the crime of train robbery, Such being the case, the general provisions for carrying out a death penalty obviously would not be repealed by the ordinary repealing clause in an act which merely abolished the death penalty for murder.

Nor do we think his second position is any more tenable. As we pointed out in the La Porte case, *supra,* it cannot be claimed that a general repealing clause such as was contained in the initiative act was intended to repeal the permanent saving sections of the 1901 and 1913, Penal Codes. As has been well stated in many of the cases discussing the effect of such saving sections, their very purpose is to prevent such a construction of the law as petitioner attempts to place upon it. It is urged that if we hold the general saving sections were not repealed we would be in effect holding that a subsequent legislature or a vote of the people may not repeal an act previously passed. This contention is fully discussed by us in the case of *In re Higgins' Estate, ante,* p. 252, 252 Pac. 515, wherein we held that any subsequent legislature could, of course, repeal a saving act passed by a previous one, but that the repeal must be either express or in terms so unmistakable that no other

construction could be placed upon the subsequent act, and the same interpretation should be placed on the effect of an alleged repeal by initiative.

If petitioner's contention is sound, and the people intended to and did repeal the saving sections by the initiative act of 1916, the legal effect would have been not only to relieve petitioner from any fear of the death penalty ever being carried out in his case, but to grant to him and all others in his situation a full and complete pardon for proven, wilful, deliberate and premeditated murder, and further to provide that any murder of any kind whatever, which had been committed by any person prior to the adoption of the initiative act, was fully and completely pardoned, and that no penalty of any nature could ever be enforced for such a crime. To hold that the people of Arizona, when by a bare majority they adopted the act of 1916, and included therein an express provision that a person convicted of first degree murder could under no circumstances be pardoned, commuted or paroled, except upon newly discovered evidence establishing to the satisfaction of each and every member of the board of pardons and paroles that he was innocent of the offense whereof he had been convicted, meant to create such a situation, would attribute to them a state of mind as incredible as absurd.

Petitioner's final contention apparently is that whatever may be the legal effect of their action, the people in 1916 certainly intended at the very least that his sentence be commuted to life imprisonment, and therefore we should in some manner enforce that intention. We can only answer that our function is to declare the law as it is, and not as it might have been. Any such intention, if it did actually exist in 1916, was certainly changed by the people in 1918, when by an overwhelming vote they reinstated the death penalty for murder, and the legal and moral

effect of the two initiatives, in so far as petitioner is concerned, was precisely the same as though the board of pardons and paroles to-day decided a prisoner should be pardoned, but to-morrow, and *before they had acted on such decision,* changed their minds and failed to recommend the pardon. Such action would, of course, give rise to no legal rights, and his' moral right to a pardon or commutation of sentence would be neither greater nor less than if his case had never been considered by the board.

We hold, therefore, that by virtue of the provisions of the saving sections of the Codes of 1901 and 1913 the petitioner is legally restrained of his liberty by the superintendent of the state prison; that when the superintendent of the State Asylum for the Insane certified to the Governor that the petitioner had recovered his reason, it was the duty of the latter officer to issue his warrant appointing a day for the execution of the judgment which we have held was still of full force and effect; and that if the Governor fails for any cause to issue such warrant the county attorney of Maricopa county and the superior court thereof should proceed under the provisions of the act of 1909 as it existed at the time the original crime was committed, after which petitioner may, if he desires, appeal to the discretion of the board of pardons and paroles as in other cases involving a death penalty.

The writ is quashed, and the petitioner remanded to the custody of the superintendent of the state prison until such time as the judgment of the superior court of Maricopa county on the verdict be carried into effect, or he be in some legal manner discharged.

ROSS, C. J., and McALISTER, J., concur.