LEMUEL DAWSON V. THE STATE.

1. An indictment is good, notwithstanding it be characterized by awkward use of language and clumsy construction of sentences, provided the offense is charged in plain and intelligible words.

2. The ruling in Johnson v. The State, (27 Texas, 758,) cited and approved, to the effect that in charging a jury in a case of felony, it is only necessary for the court to give such instructions as are applicable to every legitimate deduction which the jury may draw from the evidence.

3. The rulings on the subject of threats, in Pridgen v. The State, (31 Texas, 420,) are hereby expressly denied and overruled; and this court now re-affirms the rule expounded in Johnson v. The State, viz.: When a party who has taken the life of another relies upon threats against his own life, as an element in his defense, he must show that at the time of the

killing some act was done by the deceased from which he, the accused, might reasonably infer an intention of immediately carrying such threats into effect; in which case the accused was justified in the use of such means as were within his power for his own defense, and if death ensued thereby the homicide was justifiable.

4. The present Constitution of this State, article 5, section eight, empowers the jury, in a capital case, to substitute imprisonment at hard labor for life, in lieu of the penalty of death. *Held*, that this provision is neither a repeal nor an amelioration of former laws inflicting death as the penalty, inasmuch as the penalty of death may still be legally inflicted; and the only effect imputable to this provision of the Constitution is to vest in the jury the power of commuting the punishment.

5. In an indictment for murder, the name of the party killed was written " Woodlin," but in other parts of the transcript it is variously written " Woodin," " Woodine," " Woodlow " and " Woodland." But there is to be found in the transcript no indication whatever of any controversy or question in the court below, on the subject of a variance between the name of the deceased, as alleged in the indictment, and as proved at the trial—for which reason, and in view of other obvious inaccuracies in the transcript, it is *held* that these discrepancies in the name of the deceased are to be regarded as clerical errors, arising from carelessness in transcribing the record, and in no degree impugning the judgment of the court below.

APPEAL from Rusk. Tried below before the Hon. J. B. Williamson.

The indictment contained two counts, in the first of which the appellant was charged with the murder of George Woodlin, on the first of August, 1868, by the means of a pistol. The second count charged the same offense by means of a bowie knife. The evidence proved that both weapons were employed by the defendant.

Henry Morris, for the State, testified that about dinner time on or about the first of September, 1868, Woodlin, one Shaddin, and one McCarter were standing on a platform in front of March's store in Mount Enterprise, Rusk county; that the accused walked up and spoke to them, and said something to Shaddin, who was a

clerk in the store, about a business transaction, and the accused and Shaddin walked into the store. Witness and McCarter also walked in, and witness took a seat on the opposite side of the store from where the accused and Shaddin were standing at a counter, making a calculation about some oil cloth. There was a window opposite the counter, through which witness saw the deceased, who was on the platform nearly opposite the window. A very short time after, the deceased was in the act of stepping off the platform, one foot off, perhaps, and appeared to be going towards Norvell's store, on the opposite side of the street, and while in this position the accused, who was standing near the door, looked out and stepped to the door, leveled his pistol, paused, and after holding it a moment, fired. The deceased was in the act of turning, when accused fired a second time. The parties then clinched, and the accused, with a small dagger, or bowie knife, inflicted a number of stabs upon the deceased, who sank down, and accused walked quietly away. The deceased died in a few moments. The witness saw no weapon on the deceased, and none was found on his person, except a barlow knife.

McCarter, also for the State, testified to the same effect, except that he could not, from where he stood in the store, see the deceased at the time accused fired from the door, nor did he see the struggle between them. The platform was eight or ten feet wide. Deceased had been at the store about two hours when the killing took place.

Dr. Linthicum, a physician, testified that he examined the body of the deceased, and found one wound from a bullet, and thirteen or more wounds from a knife. The wound from the bullet and five or six of those from the knife would, in the opinion of the witness, have proved mortal. The deceased must have stood in a quartering position to the accused when the shot was fired, judging from the range of the bullet. The platform was from nine inches to a foot lower than the floor of the store house. This witness

testified that on the day of the killing he was going into Mount Enterprise, and on getting within seventy-five or eighty yards of March's store he saw two men engaged in a fight at the corner of the platform. They were clinched, and one was cutting the other with a knife. Witness stopped, and one of the parties fell; the other stepped over him and walked towards witness, who then saw that it was the accused. He came up to witness and asked him if he saw him kill Woodland. Witness replied that he saw the conflict, and accused then asked some questions about an occurrence at Furlow's grocery, to which witness replied, and defendant walked off in his usual manner.

The "occurrence at Furlow's grocery" was explained by the following testimony introduced by the defendant :

Memming testified that about five weeks before Wooland was killed, the witness and two other persons, together with the deceased, were engaged in a game of cards for amusement, at Furlow's grocery. The defendant walked in and spoke to the party in a friendly way, and leaned upon a chair, looking at the game. In a few moments the deceased remarked, ".I have enough of this game;" came from the table ; walked round to where the defendant was ; drew a pistol, cocked it ; presented it at the defendant, and abused him as a coward, liar, etc. ; charged the defendant with having talked about him, which the defendant denied, and witness stepped in between the parties and prevented the deceased from shooting. The deceased might have shot before witness got between them, but he would have had to have been mighty quick. The parties "emigrated and went off and had a talk, but he (witness) don't know what was said."

R. C. Linthicum testified to the same effect, but added that the deceased said that defendant had said, among other things, that he intended to slap him, the deceased, in the face with his pistol ; and deceased added, "I will now slap yours with my pistol," which he did. Before the slapping, the defendant denied having said anything which deceased charged him with having said.

Stephens, for the defense, testified that he met the deceased in the road about three weeks before the killing, and deceased told witness he intended to kill the defendant.

Kyle, a freedman, for the defense, testified that about two weeks before the killing he met the deceased in the road; that deceased asked witness if he knew defendant, and what he thought of him. Witness replied that he thought him a clever man, when the defendant observed, " I don't think so; I intend to kill him; I intend to try to provoke him to do something to me, so that I may have an excuse to kill him; and if I can't get him to do anything to me, I will kill him anyhow;" and drawing his pistol he added, " here is the thing I will lift him with." Witness communicated this conversation to the defendant before the day of the killing.

Marcus Hall, freedman, for the defense, testified that he lived at Mount Enterprise; that about ten or eleven o'clock in the morning of the day of the killing, the deceased came to the shop where witness was, and asked witness to lend him his pistol, remarking that he saw Lemuel Dawson in town, and he intended to kill him before he left town. Witness told him he could not lend him a pistol for any such purpose, as it would get him into a scrape; and deceased then went off. Some time afterwards defendant came to witness and said he wanted to swap pistols with him, as witness's pistol was better than his and he wanted it because he was going to the Indian Nation. Witness and defendant then went to witness's house, about three hundred yards off, and on their way witness told defendant what the deceased had said; to which the defendant made no reply. " Deceased " (meant no doubt for " defendant ") examined witness's pistol, said it was too old for him, and then went off. Witness sat down to his dinner, and before he had finished eating he heard the pistols fire; and stepping to the door, and looking towards March's store, he saw the men engaged in a struggle, one of whom he recognized as the defendant, but did not identify the other.

From the foregoing evidence, which is substantially all in the record, it is obvious that but one element of a good defense was wanting—evidence that at the time of the killing the deceased manifested by some act a purpose of then executing his threats against the defendant.

The charge of the court below to the jury was as follows:

"If you are satisfied from the evidence that the defendant, in the county of Rusk, any time within five years next before the filing of the indictment in this cause, cooly, wilfully, deliberately, and with formed design, and by the means as charged in the indictment, killed Woodland, then you will find him guilty of murder in the first degree; otherwise, you will not.

"If Woodland had previously made threats to kill the defendant, and if those threats had been made known to the defendant, and if Woodland, by some act done by him at the time of the killing, manifested an intention to kill the defendant, then you are instructed that the defendant had the right to kill.

"You should apply the evidence to Woodland at the time of the killing, and determine by it whether his acts at that time showed an intention to kill the defendant. If his acts at that time showed such an intention, then this defendant is not guilty. If they did not show such an intention, then the defendant is guilty, if you find as otherwise charged.

"Threats will not justify—fear will not justify—unless the acts of the party at the time of the killing showed an intention to execute the threat, clearly to the mind of the defendant.

"You should carefully apply the evidence to every word of this charge as containing all the law of this case, and find your verdict in accordance therewith. If you have a reasonable doubt of the guilt of the defendant, you cannot convict."

The verdict was murder in the first degree. A motion in arrest of judgment, based upon alleged defects in the indictment, was made and overruled, and the defendant excepted.

A motion for a new trial was then interposed, alleging that the indictment was insufficient to support a verdict of murder in the first degree; that the charge was erroneous, in omitting instructions on the different degrees of murder, and the crime of manslaughter, etc. This motion was also overruled, and the defendant duly excepted.

The defendant gave notice of appeal, and sentence of death was passed upon him, but its execution stayed until a decision of the appeal. The errors assigned correspond to those urged on the motions in arrest and for a new trial.

*Wm. Steadman* and *Moore & Shelley*, for the appellant.—The indictment charges the defendant with the murder of George Woodlin. This is the name as it is plainly, clearly and distinctly written wherever it occurs in the indictment. But there is not one word in this entire record, outside of the indictment, from which it can be inferred that George Woodlin has been killed. The statement of facts shows that there was proof that some one was killed. But who was it? Unquestionably it was the duty of the State to prove that the person named in the indictment was the party killed, and unless this was done the verdict should be set aside. We must presume that the statement of facts contains all the testimony which was before the court. From it we cannot, with any great certainty say that there was any proof before the jury as to who was the person killed. The witnesses, with one single exception, speak of the person killed as the deceased, without giving him any name. But it is very certain, if we can tell from the statement of facts the name of the person killed by the defendant, it was not the person named in the indictment, but altogether a different person; for the person named in the statement of facts is as plainly and unmistakably called Woodland or Woodlund, as the other in the indictment is called Woodlin. Now it is quite evident, however liberally the doctrine of *idem sonans*

may be applied, these different words do not indicate the same name to the ear, any more than to the eye or common understanding of men. Whether this discrepancy is one of fact or a mere clerical error we do not know, nor need we, nor can the court know anything on the subject beyond what it learns from the record.

IV. We have one other ground to present to the court why the judgment should not be affirmed. It is an elementary rule that "if a penal statute be repealed after acts done in violation of it, the violator is not subject to punishment under it after the repeal," (Smith's Com., 896); and this "principle is held to apply as well to the proceeding upon appeal in the appellate court as to the court having original cognizance of the offense—and as well when the repeal took effect, after the removal of the cause to the appellate court, as before." (Wall v. The State, 18 Tex., 697.) For, as the judgment of the court of original jurisdiction is inoperative until the action of the appellate tribunal, and as no court can pronounce judgment or pass sentence unless there is a law in force at the time its judgment is given, or sentence passed authorizing it, the repeal of the law upon which the judgment of the court below was rendered, pending the appeal, is as fatal to the prosecution as its repeal before the trial in the court having original jurisdiction of the offense. Of course the effect is the same, whether the entire law is repealed, or so much of it merely as imposes a penalty for its violation—for a law without a penalty for its violation cannot be enforced by the courts. And the repeal of the law fixing the penalty is equally fatal, when there is no saving clause in the repealing statute, although the repeal is merely by implication, from the increase or amelioration of the penalty, as fixed by the new law. (Commonwealth v. Kimbal, 21 Pick., 375; Leighton v. Walker, 9 N. H., 61; 4 Burrow, 20; 1 Leach's cases, 306.) Now let us apply these general principles, which we suppose will not be disputed, to the present case. The

crime of murder, by the Criminal Code, is divided into murder in the first and murder in the second degree. And murder in the first degree, which is the grade of offense which we have to consider in this case, is punished by death. (Penal Code, Art. 612a.) But the present Constitution of the State (Constitution, Art. 5, § 8,) enacts, "that in all cases when, by law, it may be provided that capital punishment may be inflicted, the jury shall have the right, in their discretion, to substitute imprisonment to hard labor for life."

The code says the punishment of murder in the first degree shall be death. The Constitution says, in effect, it may be death or imprisoment to hard labor for life. Now, does not this operate as an implied repeal of the penalty fixed to murder in the first degree by the code? It is certainly a modification and an amelioration of the penalty prescribed by the code for the punishment of this offense. In the case to which we have referred of The Commonwealth v. Kimball, (21 Pick., 375,) the court, in considering the effect of the amelioration of the penalty by a subsequent law, in effect say that the former law enacted that the offense should be punished by a penalty of twenty dollars. The latter declared that the same offense should not necessarily be punished by a penalty of twenty dollars, but by such penalty, not more than twenty dollars nor less than ten dollars, as the court should direct. That the provision of the former act by which the penalty was fixed was inconsistent with the provision of the latter, and by the latter repealed. Just so in this case; the former law declares that murder in the first degree shall te punished—without discretion by either jury or court—with death. The present law says the same offense shall be punished by death or imprisonment to labor for life, as the jury in their discretion may determine. That a new penalty for murder in the first degree is substituted by the Constitution for that prescribed by the code, will not, we suppose, be questioned. But it may be said that the

common law rule has been abrogated by Articles 14, 15, 16, 17 and 18 of the Criminal Code, and under the authority conferred by these articles of the code the court may pronounce sentence against the appellant upon the verdict of the jury, and enforce the penalty fixed by the code to the crime of which he has been found guilty. We submit that these articles of the code, neither in their letter or spirit authorize the court to enforce this penalty. Unless the fourteenth article authorizes it, it certainly is not authorized. The eighteenth article merely prescribes the effect which the enactment of the code should have in respect to offenses committed and penalties incurred under former laws, but at the same time it recognizes the rule that the defendants shall receive the benefit of any amelioration of penalty which might be made in the code in respect to the former laws. The sixteenth article provides when a new penalty is substituted by a repealing act the rule in Article 14 shall be applied. Article 14, in substance, declares that offenders shall be tried under the law in force when the offense was committed, and punished under that law, " except that when by the provisions of the second law, the punishment of the offense is ameliorated, the defendant shall be punished under such last enactment, unless he elect to receive the penalty prescribed by the law in force when the offense was committed."

Now, on a technical and literal construction, this article does not provide for the present case, and cannot in strictness be applied when the new law leaves it to the discretion of the jury in fixing the penalty prescribed in the new statute, unless the case comes on for trial before the jury after the enactment of the new law. But by the common law rule, and if the code is silent, we may invoke it, if the penalty is abolished before sentence, it cannot be pronounced. But if we are to be controlled by the code, how then should it be construed and applied? It is to be noted, that while the code requires offenses to be tried under the ·

law in force when the offense was committed, it does not say that they are to be punished under the law in force when the verdict is returned. It surely will not be claimed, because the verdict is returned by the jury previous to the repeal of the law, the court, notwithstanding its repeal before the judgment is entered on the verdict, may still enter judgment upon it, and carry it into execution. To illustrate, suppose a party to have been indicted and a verdict of guilty returned against him by the jury under Article 653 of the code, for the offense of rendering slaves discontented with the state of slavery, and pending the question in arrest, whether the article was not unconstitutional because in violation of the liberty of speech and the press, this article of the code is abolished, can it for a moment be supposed that the court could still, if it concluded the article constitutional, go on and pronounce judgment?

*E. B. Turner*, Attorney General, for the State.—The second objection is based upon the supposed error in the charge of the court, or rather because the court did not charge in regard to all the various grades of offenses embraced in the charge of murder. They cite Villereal v. The State, 26 Tex., 107, and Mariah v. The State, 28 Tex., 698.

The soundness of the rule as established in these cases is admitted; but the rule announced in each case sprung from the facts as offered in evidence. In each case there was testimony introduced which went far to reduce the offense, and evidently should have relieved the party accused of the greater offense.

Not so in this case; there is no *scintilla* of evidence that mitigates or extenuates the offense. The proposition then is, shall the court be required to make a charge upon a state of case not before the jury? The court stated the law when he said in substance the defendant is guilty of murder, or is justified in law in the killing because of threats made and acts evidencing a purpose to execute. (Johnson v. State, 27 Tex., 766; Daniels v. State, 24

Tex., 389 ; 23 Tex., 210; 18. Tex., 343; 15 Tex., 311; 12 Tex., 537.)

There was no evidence of any act which could by any legal possibility avail to justify. There was no heat of passion; there was no quarrel, no hard words even. The court would have been at fault in duty, had he by a charge assumed that under the law this killing was less than murder in the first degree. He told them plainly what was necessary to constitute murder in the first degree, and they said those facts existed. I insist that the court should not have submitted any charge about murder in the second degree. Why? The counsel say because of previous threats. My reply is, that threats justify an excuse only when certain other things are shown; they do not reduce the offense. No pretense exists for saying that the threats should, under the law, avail. Then they are not to be taken into the account at all. Now let us strip the case of all threats, and will gentlemen then say that the court should have given a charge defining the degrees of murder and the offense of manslaughter?

Again, they complain of this charge because defendant's guilt is made dependent solely upon the question whether the deceased done some act evidencing, etc., rather than upon the conception of · the defendant. My reply to this is, such is the law. (Johnson v. State, 27 Texas, 766 and 767.) If it be true that these threats deserve consideration, then I say it is the province of the Governor and not of the courts to extend clemency. To leave the question to turn in any degree upon the opinion of the deendant, would be to furnish means to every assassin for escape.

But I cannot use words better calculated to show the weakness of the position assumed in this regard than those used by his Honor George F. Moore, who delivered the opinion of the court in Johnson v. the State, in 27 Texas, to which I have made reference.

We now reach a point not appearing in the transcript. It is

insisted that the name of the deceased is not uniformly spelled alike, and that therefore the *corpus* of the offense is not proven. It is true that the deceased's name is not uniformly spelled, and I had and have done what I could do to remove even the possibility of doubt; yet I did not deem the matter of sufficient importance to ask a continuance, nor is the Attorney General expected to make affidavits in regard to transcripts. In regard to the fact of the murder as charged, this court cannot avoid the certain conviction of guilt as charged. That the discrepency is partly owing to similarity of sound and partly to carelessness is evident from an examination of the transcript.

In the indictment the name of deceased is George Woodlin. In the charge of the court it is Woodland. In defendant's motion to arrest the judgment it is spelled Woodland. In the statement of facts the name is spelled once Woodland and once Wooland.

It will thus be seen that the different modes of spelling the name is nearly as varied as the persons who write the name.

This, together with the fact that no objection is made below as to the identity of the person, and as no error is assigned in the record looking to this discrepancy, we are forced to know that this has answer from the fact that the name itself, as pronounced, may be easily taken for Woodline, Woodlin, Woodland, or Wooland. Now, I ask in all candor, shall justice be defeated by this quibble? The sound is nearly the same; *idem sonans* is the rule that should be applied in this case, as fully and forcibly as in case of a defendant. Is is not after all a question for the jury, (see Bell v. State, 25 Tex., 574,) and can the point arise here?

The next and last point made is, that the penalty has been repealed by the new Constitution, and the defendant cannot be punished for an offense not now punishable by law. If this proposition be true; if indeed there is no penalty for murder, then I concede the argument; because, if the repeal is by fundamental law, a clause in the code, providing that the punishment should be inflicted ac-

cording to the law at the date of the commission of the offense, could not prevent a repeal by constitutional provision. If, however, there is no repeal, then the law as declared in Article 1616, Paschal, is applicable. This, in connection with the qualification of the common law rule as declared in the next article, settles this question, and defeats the proposition advanced by them.

I cite Wall v. The State, 18 Tex., 696, 698, 699. This case lays down the whole law of this case, unless it be maintained that there has been a repeal of the death penalty, which there clearly has not, by any words of repeal or of necessary implication.

WALKER, J.—At the Spring term of the District Court for the county of Rusk, in the year 1869, the appellant was indicted, tried and found guilty of the murder of George Woodlin.

An appeal is taken to this court. It is urged that the court below erred in overruling the motion in arrest of judgment. The motion was predicated upon the alleged insufficiency of the indictment.

The indictment is subject to verbal and grammatical criticism, but we think it cannot be claimed that the awkward use of words, and clumsy construction of some of the sentences, render it bad in law. We think it would have been good at common law, and is doubtless good under our code. The language is perhaps more difficult for a skillful linguist and grammarian to understand, as well indeed as the intention of the pleader, than the same would be to one relying less upon the rules and principles of our language as used by the educated; but we think the offense is " charged in plain and intelligible words." (See Paschal's Digest, Art. 2863.)

It is urged that the court erred in the charge to the jury, both as it was given and refused. Believing that this exception is not well taken, we can furnish no better reason for our opinion than that given in 27 Texas, 758, in Johnson v. The State.

The learned judge in deciding that case remarks: " Though in

every case of felony the court is required by statute to give a written charge, whether asked by the parties or not, yet it is *only* necessary for the court to give such instructions as are applicable to every legitimate deduction which the jury may draw from the evidence."

We think the charge in this case was all that the rule of law, as thus correctly laid down, requires. There was no evidence in the case from which any other legitimate deduction could have been drawn than that which the jury did draw; nor is the contrary even claimed in the argument.

But this court, in the case referred to, have laid down the rule which applies to this case: " When a party who has taken the life of another, relies upon threats against his own life, as an element in his defense, he must show that at the time of the killing, some act was done by the deceased from which he, the accused, might reasonably infer an intention of *immediately* carrying such threats into effect, in which case the accused was justified in the use of such means as were within his power for his own defense, and if death ensued thereby the homicide was justifiable."

In the present case there was no act of any kind, on the part of the deceased, toward the defendant until the defendant had shot him, when the defendant and deceased were seen clinched and struggling, and the defendant literally cutting the deceased to pieces with a knife. The deceased, being unarmed, was shot from behind as he was leaving the gallery of the store house, and at a moment when he apparently was expecting no assault, and was not prepared to repel one. Art. 2270, Paschal's Digest, is an embodiment of the legislative mind on this subject, and the rule in Johnson's case exactly accords with the law as therein set forth; and it is greatly to be regretted that this wise and wholesome rule should ever have been disturbed by this court.

This leads to a consideration of the later case of Pridgen v. The State, decided at the October term, 1868, at Austin. This

case was decided by a divided court, two of the five judges on the bench dissenting. We cannot regard the case as having been correctly decided, nor do we think the effect of such a rule as is therein laid down would be otherwise than productive of the most serious harm to the public. This court, therefore, will cease to regard the ruling in that case as of any binding effect whatever upon the courts of the State, and we do formally reaffirm the doctrine as quoted from the case of Johnson against the State.

We are now brought to consider another of the objections urged against the judgment in this case. The indictment charges the appellant with the murder of George Woodlin. We find in different parts of the record, this name is spelled "Woodlin," "Woodline," "Woodlon" and "Woodland." If there was any variance between the indictment and the proof, it was not noticed at any stage of the proceedings below. We incline to think, from very careful inspection of the record, where we find bad spelling, and careless repetition and omission of words, that this diversity in orthography, arises from carelessness in copying the record. Mr. Chitty in his valuable work on Criminal Law, vol. 1, page 211, tells us: "Indeed, with respect to this matter, certainty to a common intent is all that the law requires, and if the description be sufficiently explicit to inform the prisoner who are his accusers, the indictment may be supported; but it is in general necessary to set forth the names of third persons with sufficient certainty." Again at page 170, this learned author says, "on the application of this rule, and the degree of certainty, there are a variety of decisions in the books, and very great niceties have been allowed to prevail, as we shall see in the course of our inquiries. This circumstance has frequently been regretted by able judges as offering too many opportunities for the escape of prisoners, to the encouragement rather than to the depression of crime."

Thus Lord Hale observed, 2 Hale, 193, "That the strictness

required in indictments has grown to be a blemish and inconvenience in the law, and the administration thereof; that more offenders escape by the over easy ear given to exceptions to indictments than by the manifestation of their innocence; and that the grossest crimes had gone unpunished by reason of these unseemly niceties." This is old law, but its philosophy and sound sense have lost nothing of their force, and our Legislature will have acted in vain on this subject if courts still indulge in this "unseemly nicety."

On the trial, neither the court, the jury, the counsel, the witnesses, nor the appellant appear to have been aware of any variance between the name of the deceased as spelled in the indictment, as used by the court, the attorneys, and witnesses; and this fully convinces us that the doctrine of *idem sonans* should apply here, unless the clerk has misspelled the name in the record with reiterated carelessness. This we believe to have been the case.

We now come to examine the last reason urged by appellant's counsel for setting aside this judgment.

It is said that since the trial the rigor of the law has been relaxed and the punishment ameliorated. We confess we are unable to see in what manner. Article 14 of the Criminal Code furnishes us the following rule: "When the penalty for an offense is prescribed by one law, and is altered by a subsequent law, the penalty of such second law shall not be inflicted for a breach of the law committed before the second shall have taken effect. In every such case the offender shall be tried under the law in force when the offense was committed, and if convicted, punished under that law, except that when by the provisions of the second law, the punishment of the offense is ameliorated the defendant shall be punished under such last enactment, unless he elect to receive the penalty prescribed by the law in force when the offense was committed."

But we are referred to section 8, article 5 of the new Consti-

tution, and it is claimed that by this article the prior law is repealed, or ameliorated.    The article reads thus :

"In the trial of all criminal cases, the jury trying the same shall find and assess the amount of punishment to be inflicted, or fine to be imposed, except in cases where the punishment or fine shall be specifically imposed by law; *provided*, that in all cases where by law it may be provided that capital punishment may be inflicted, the jury shall have the right to substitute imprisonment to hard labor for life."

Now, this can neither be said to be a repeal nor an amelioration of the former laws, for the jury may still assess the death penalty, in their discretion.    But they could not do it without legal authority, and the law is therefore still in force ; and all that can be claimed for this section of the Constitution is that it vests in the jury a power of commuting punishment heretofore vested in the Executive.

For the reasons assigned, the judgment of the district court is affirmed.

Affirmed.