7　245
31　592

## BILL WALKER *v*. THE STATE.

1. MURDER IN THE FIRST DEGREE — EFFECT OF REVISED CODE ON PENDING CONVICTIONS. — In 1878, the appellant, having been convicted of murder in the first degree, appealed from the capital judgment against him, and his appeal was still pending in this court on July 24, 1879, when the Revised Penal Code took effect and changed the previous penalty for the offence from "death" to "death or confinement in the penitentiary for life." It is insisted in his behalf that this change repealed the previous law, and thereby operates immunity to him from the penalty imposed by virtue of the law so repealed. But, *held*, on principle as well as authority, and conclusively in view of sect. 6 of the "Final Title" of the Revised Statutes, that the change so made in the penalty for murder in the first degree does

not invalidate the conviction of the appellant, nor exempt .him from. the penalty adjudged against him, by any retrospective operation or otherwise.

2. Construction of Statutes. — The legislative intention is the objective point of all rules and principles for the construction and interpretation of statutes; and, avoiding irrational deductions and absurd results, these rules and principles must be applied in subordination to the legislative intention. See the opinion in full on this topic, with especial reference to the effect on previous laws of the adoption of the Revised Statutes and Codes.

3. Repeal of Statutes by implication is not favored, and to operate such a repeal the repugnancy must be plain, unavoidable, and irreconcilable.

4. New Trial. — Surprise is not cause for new trial in this State; but by express provision of the Code it may, though it arises after the commencement of the trial, entitle the party to a continuance or to a postponement of the trial.

5. Confessions. — Nc inflexible rule controls the admission of a subsequent confession made after a previous one had been educed by improper influence. In such cases the inquiry is whether, in view of all the circumstances, the improper influence had been so expurgated as to remove all doubt of the spontaneity of the last confession. If this admits of a doubt, the confession should be excluded.

6. Practice in this Court. — Exception cannot be primarily taken in this court to the competency of evidence admitted at the trial below. The exception must be duly taken at the time, and be brought up in the record, to invoke the revisory power of this court.

7. Murder — Evidence. — In a trial for murder, the prosecution proved that footprints were found on the premises where the assassination had been perpetrated, and was further allowed, over objection by the defence, to prove that the examining magistrate compelled the defendant to make his footprints in an ash-heap, and that the footprints so made corresponded with those found on the premises where the homicide was committed. It is objected that the evidence was incompetent because violative of the guaranty in the Bill of Rights that "one accused of crime shall not be compelled to give evidence against himself." But *held*, on review of the authorities, that the objection is not well taken, nor the evidence within the inhibition of the Bill of Rights. Note the distinction taken between this case and that of *Stokes* v. *The State*, Supreme Court of Tennessee, not yet reported.

Appeal from the District Court of Robertson. Tried below before the Hon. S. Ford.

At the December term, 1876, the appellant was indicted for the murder of James Munroe, on August 19, 1876, by striking and cutting him with a hoe. Upon his first trial,

which was had at the January term, 1877, he was found guilty
of murder in the first degree, and adjudged to suffer death.
On his appeal from that judgment to this court, he obtained
a new trial on grounds which are disclosed in the report of
the case in 2 Texas Ct. App. 326. The second trial was
had in June, 1878, and also resulted in the conviction of
the appellant of murder in the first degree, and judgment
of death; and he again appeals, upon grounds indicated in
the opinion of the court.

The first witness for the State was John Perry, who testi-
fied that he knew James Munroe, and that he came to his
death on August 19, 1876, at his home in Robertson County.
During the preceding evening, when the sun was about an
hour and a half high, witness saw Munroe at the latter's
home; and on the next morning saw him lying on his bed
in his own house, murdered. His wound was about the
head, near the ear, and was made by a blow with some hard
instrument; the head seemed to have been mashed. He was
lying diagonally across the bed, speechless, but struggling
occasionally. He was in his night-clothes, and could not
have travelled after the blow was inflicted on him. Witness
saw blood on the floor and bed, but observed none on the
walls. The deceased was not bleeding much when witness
saw him, but had been previously. The wound could have
been made with an iron grubbing-hoe. No person had been
in the room that morning, before witness. Susan Smith
had called for McClain, and the latter had called to witness,
saying that something was wrong at Munroe's. Witness
called at the edge of the gallery, and then went on the
gallery and called again. The door was closed, and he
pushed it open and looked in, and then saw some keys lying
on the floor, by a half-open trunk, which he did not ex-
amine. A pair of pants, with blood on them, lay behind
the door, and a knife, he thinks, was lying by them. A
dog was tied to the gallery post with a small rope, and a
pile of seed-cotton was on the left end of the gallery as one

would enter the house. Witness made no search for tracks. He had, in the preceding spring, known the defendant, who then went by the name of Henry Walker, but who, after his arrest, went by the name of Bill Walker. The defendant had stayed with deceased for some time during the spring preceding the murder. Besides the front-door leading into the room where the deceased was found, there was another door, which led from that room to another one, in which there was a window. Witness thinks there was no window to the room in which the deceased was lying.

Susan Smith, for the State, testified that she lived on the place of the deceased, and saw him sitting on his gallery between eight and nine o'clock the night before he was killed, and he then seemed to be well. He was an old man. A little after sunrise the next morning, witness went to milk the deceased's cows, and, hearing a noise in the house, went to the door and knocked, but got no answer. Witness heard a struggling in the house. She then went to the cow-pen and called Mr. McClain, who called Mr. Perry, and the latter and witness went towards the house. Witness stopped at the gate, and cannot say who entered the house next after Perry.

George Grimes, for the State, testified that he knew the deceased, and went to the latter's house the morning he was murdered, about two hours after sunrise. This witness found the deceased in the position and condition described previously by Perry, and also saw the keys, pants, and knife mentioned by the latter. Witness and John Sanders, searching for tracks, went to the peach-orchard, and there found tracks which witness knew to be strange tracks on the premises. Some of them looked like the tracks of run-down boots, and others like barefoot tracks. Witness returned to the window of the dining-room, and near the window saw barefoot tracks, as though some one had stood upon his toes, and there was a hole in the ground which might have been made by a bar of iron used to get into the

window.  Witness next entered the room where the deceased was lying, and there saw the barefoot tracks in some ashes in the fireplace.  He then went out and trailed the track through the garden-gate to the peach-orchard.  The person had walked all over the orchard.  Witness followed the tracks through a cotton-field on the north of the house, and there they took a trail for some distance towards Miles Kelly's house.  Witness cut a stick and stuck it in the track, so that he could identify it again, and then returned to inform George Brown and Mr. Callen.  The latter cut a a cotton-stalk and measured the track.  Witness saw the same measure applied to a track in Judge Joiner's office at Bremond.  Joiner made the defendant make his track in the ashes and sand in his office, where a stove had been. The impression made was plain, and about the same as the tracks found in the deceased's house.  The measure was applied to the footprint in Joiner's office, and it was the same in every particular, — fitted it exactly.  Witness could not tell much about the track found at the window, but measured it across the impression of the toes.  The track in Joiner's office corresponded with that of the toes at the window, and with the track found in the orchard. Witness did not measure the boot-track.  On cross-examination, the witness said a person could change his track in his walk, but he could tell whether a track was a natural one or not.  The defendant was under arrest when Joiner made him make the tracks.  On reëxamination, he said the tracks he found were natural tracks.

Mary Killen recognized the defendant, and lived on the same place that he did at the time Munroe was murdered. Defendant had cleaned out a well, and witness rinsed the mud off his clothes after he cleaned the well.  Witness had washed his clothes three or four times ; they were a coarse striped shirt and white pants.  After rinsing the defendant's clothes on the occasion mentioned, witness saw them in Judge Joiner's office in Bremond ; she knew them by the

mud on them.   The defendant went off the Thursday night next before the Saturday night when Munroe was killed. The following Sunday morning, a half-hour by sun, witness saw him again ; he came from towards Bremond, and was wearing some new clothes.   He brought to witness's daughter a new dress, hat, underskirt, and pair of shoes.   On her cross-examination, she said the defendant had some money when he went off the Thursday before the killing.

O. C. Morehead, for the State, testified that about a month before the homicide he paid $20 to the deceased for cattle, and there were three five-dollar bills in the amount. Witness had a five-dollar bill with a hole punched in it, and similar to the bill now shown him in court.   Witness got the bill from his meat-market, and kept his money derived from that source separate from his other money.   He paid Munroe out of the market-money, but could not say that the bill in question was part of the money he paid him. Knows, however, that he paid out the punched bill about that time, and does not remember of then having made any payments out of his market-money other than the payment to Munroe.   On cross-examination, he stated that his only reason for saying that he paid the punched bill to Munroe was that he bought all his cattle from Munroe.

Mrs. Marstrandt, for the State, testified that in 1876 she was merchandising in Bremond, and saw the defendant in her store at sunrise the Sunday morning when Munroe was killed.   Defendant woke up witness's husband, to sell him some goods.   Witness was called by her husband to come and get some goods which he could not find.   She sold the defendant a dress, an underskirt, hat, shoes, ruffled-bosom shirt, and gray jeans pants.   When he came he had on ragged pants and shirt, and witness saw that he needed others.   The whole bill amounted to $11.   Witness asked him why he came that time of day ; and he replied that he could not come sooner, for he did not have any money.

George Brown, for the State, testified that he was at

Munroe's the morning of the homicide, and found Munroe still breathing. Witness was shown some tracks which led off through the orchard and cotton-field. Witness being informed that some bloody clothes had been found in the woods, some two hundred yards from where the defendant lived on Graves's place, he arrested the defendant on the Tuesday after the murder. When arrested, he was wearing a white shirt and blue pants, being the clothing which was identified by Mrs. Marstrandt as the same she sold to him. Seven dollars were found on his person, of which a five-dollar bill with a hole in it was part, — the same bill being here shown to witness and identified by him. Witness was present at the examining trial of the defendant before Judge Joiner for the murder of Munroe. The defendant made a confession at that time. He was cautioned by Judge Joiner that such confession would be used against him on the final trial. He confessed that he and Green Patterson had laid the plan to kill Munroe; that he went with Patterson and peeped through the crack, but did not go in; and that Patterson did the killing. Their object was money, to enable him to carry off Patterson's sister. Witness does not remember whether the defendant said he got any money or not.

On his cross-examination, this witness stated that he knew part of the defendant's confession to be false; but the record does not show to what part of it he had reference. After the confession before the examining court, the defendant made other statements, which implicated different persons with himself. The defendant may have known of threats which had been made.

The defence introduced Mr. Graves, who testified that the defendant was living on his place at the time Munroe was killed, and left there on the Thursday preceding the killing, saying that he was going to Bryan after some clothing and would be back in about a week. Witness had paid him some money, but not more than $2 or $3, and thought he could not have had as much as $20.

Mr. Nash, for the defence, stated that he knew nothing particular about threats, but that the defendant was somewhat roughly treated and made a confession prior to the confession at Joiner's office.

The jury, as already stated, found the defendant guilty of murder in the first degree. He moved for a new trial, on grounds which are sufficiently indicated in the opinion.

*F. H. Prendergast,* for the appellant. The first error assigned is that the court should not have allowed George Grimes to testify as to the result of a comparison between tracks found near Munroe's house and a track which the defendant was compelled to make while under arrest. Is it proper for an officer in charge of a prisoner to compel him, or allow him to be compelled, to do any act that will assist the State in convicting him? If the defendant " shall not be compelled to give evidence against himself" (Bill of Rights, sect. 10), how can he be compelled to put the State in possession of any fact which the State says goes to establish his guilt?

In the case of *The State* v. *Graham,* 74 N. C. 646 (reported in 21 Am. Rep., and in 1 Am. Cr. Rep. by Hawley), the officer compelled the prisoner to put his foot in a track found near where the larceny was committed, and testified to the result of the comparison. The court held the evidence competent, and say (which we say is not correct) that it is similar to a defendant wearing a mask to prevent being identified ; and *The Albany Law Journal* of December 1, 1877, dissents from the case, and says in that State a woman was charged with having suffered an abortion and was compelled to submit to a medical examination, and the conviction was set aside. In the case of *Jerre Stokes* v. *The State,* 2 Texas L. J. 243, the defendant was only requested to give evidence against himself, and the court say that was error. But Bill Walker has been compelled to give evidence against himself, and that evidence has been used to obtain his conviction. In *Stokes* v. *The*

*State*, the State's attorney wanted to prove that the defendant's track would be similar to the tracks found where the crime was committed, and for this purpose brought a pan of mud before the jury and asked the defendant to put his foot in it. This he declined to do, and the judge told the jury that his refusal could not be taken against him. The court say the defendant was asked to give evidence against himself, and reversed the case.

If this defendant can be compelled to make an impression with his foot in order to see if it is similar to the impression made by the foot of the person who committed the crime, then if he were charged with forgery he could be compelled to take a pen and write in order to see if his handwriting was similar to that of the party who had committed the forgery. If this were so, then if he were charged with perjury, and were to deny having spoken the words charged against him, the State would be allowed to ask him what he did say if he did not say those words. The defendant was compelled to make the footprints in Judge Joiner's office; and if the information thereby obtained is offered in evidence against him, sect. 10 of the Bill of Rights protects him.

It is no answer to say that all the information obtained by this compulsion is true, for then you would be polluting the halls of justice with this maxim of modern ethics: that the end justifies the means. If this were law, then a mob might arrest a man charged with theft, and whip him and *hang* him, and if he told where the stolen property was they would be justifiable. But suppose he does not know where it is, then the mob will have punished an innocent man, or at any rate they punish a man before he has a trial. The law has its own officers to administer its punishments under appropriate restrictions; it has certain rules by which the guilt of a person is established; and it absolutely forbids that a defendant should be compelled to give evidence against himself.

The second assignment of errors is that the confession should not have been admitted. Upon the trial of the cause, the defendant's counsel was much surprised when the State proved that defendant had been cautioned before he confessed. No mention was made of such caution on the former trial (see 2 Texas Ct. App. 326), and I actually never heard of such being the case until the progress of the last trial, when the witness was asked the question. No corroboration was proved this time, and no caution before. In *Boxley* v. *The Commonwealth*, 24 Gratt. 649 (1 Hawley's Am. Cr. Rep. 655), the court say, where the testimony of the principal prosecuting witness differed materially from that given by her before the committing magistrate, that the prisoner is entitled to a new trial on the ground of surprise. We supposed that in a charge so grave as this the State would consider no amount of evidence plenary, short of the "whole truth," and that George Brown had testified on the former trial to all the material facts in his knowledge; and being thus surprised, I made no formal objection to the admissibility of the evidence. But I think the importance of the case will justify the court in considering the admissibility of this confession, in connection with the weight to be given it. Courts have considered such objections without a bill of exceptions. *Sutton* v. *The State*, 41 Texas, 513; *Goode* v. *The State*, 2 Texas Ct. App. 523, and authorities cited.

*George McCormick*, Attorney-General, for the State.

White, P. J. On a former appeal, this case was reversed because the court below erred in admitting in evidence the confessions of the defendant, because it appeared that the same had not been made in conformity with the rules prescribed by the statute. Pasc. Dig., arts. 3126, 3127. See 2 Texas Ct. App. 326.

A second trial has resulted in a second conviction of

murder in the first degree, with the death-penalty.  This last conviction was obtained by the State on the fourteenth day of June, 1878, and the case was appealed to and filed at the Austin branch of this court on the tenth day of March, 1879, where it was submitted on briefs, taken under advisement, and regularly transferred to this branch.  Since the appeal was perfected the entire statute law of the State has been revised, and the punishment for murder in the first degree has been changed from "death" exclusively (Pasc. Dig., art. 2271), to "death or confinement in the penitentiary for life."  Rev. Stats., Penal Code, art. 609.  In a supplemental brief filed here by the zealous and able counsel who has represented defendant under appointment of the court below, it is contended that the case must be reversed on account of this change in the law with regard to the punishment of the crime, and several provisions of our Penal Code are invoked in support of the position.  As the question is one which has elicited some discussion amongst the legal profession of the State, we propose to meet and settle it in this the first case in which it has been presented directly for adjudication.

We reproduce the articles of the Code relied upon, which are as follows : —

"Art. 15.  When the penalty for an offence is prescribed by one law and altered by a subsequent law, the penalty of such second law shall not be inflicted for a breach of the law committed before the second shall have taken effect.  In every case the offender shall be tried under the law in force when the offence was committed, and, if convicted, punished under that law ; except that, when by the provisions of the second law the punishment of the offence is ameliorated, the defendant shall be punished under such last enactment, unless he elect to receive the penalty prescribed by the law in force when the offence was committed."  Rev. Stats., Penal Code, art. 15.

"   ∂. 17.  When by the provisions of a repealing statute

a new penalty is substituted for an offence punishable under the act repealed, such repealing statute shall not exempt from punishment a person who has offended against the repealed law while it was in force, but in such case the rule prescribed in art. 15 shall govern.''

"Art. 19. No offence committed, and no fine, forfeiture, or penalty incurred under existing laws, previous to the time when this Code takes effect, shall be affected by the repeal herein of any such existing laws; but the punishment of such offence, and the recovery of such fines and forfeitures, shall take place as if the laws repealed had still remained in force; except that when any penalty, forfeiture, or punishment shall have been mitigated by the provisions of this Code, such provision shall apply to and control any judgment to be pronounced after this Code shall take effect, for any offence committed before that time, unless the defendant elect to be punished under the provisions of the repealed law.

" Art. 20. No penalty affixed to an offence by one law shall be considered as cumulative of penalties prescribed under a former law, and in every case where a new penalty is prescribed for an offence, the penalty of the first law shall be considered as repealed, unless the contrary be expressly provided in the law last enacted.''

Upon comparison, it will be found that the foregoing articles are literal copies from former existing statutes. Pasc. Dig., arts. 1616, 1618, 1620, 1621.

The position assumed is that the change in the law affixing an alternative punishment or penalty for murder in the first degree was intended as a complete substitute for, and operates as an implied repeal of, the former law which limited the penalty to death; that if the statute which affixed the penalty is repealed, then no further proceeding can be taken under the repealed law to enforce the punishment after the repealing law takes effect; that this principle applies as well to the proceeding upon appeal in the Court

of Appeals as to the court having original cognizance of the offence, and this too in cases where the repealing statute took effect pending the appeal in this court. In support of these propositions we are cited to the doctrine enunciated in *Wall* v. *The State*, 18 Texas, 682 ; *Murray* v. *The State*, 1 Texas Ct. App. 418, and *Sheppard* v. *The State*, 1 Texas Ct. App. 522. The same question was also discussed in *Dawson* v. *The State*, 33 Texas, 491. As applicable to the facts and circumstances of the respective cases cited, the principles enunciated in the three first mentioned will not be controverted or denied. Appellant's counsel combats the conclusion reached in *Dawson* v. *The State*, and therefore it is unnecessary to discuss that particular case.

We are of opinion that the question here raised, if necessary to be settled on precedent authority, must be investigated in the light of elementary principles, and adjudicated upon well-established and fundamental rules of statutory construction. To begin with, it is a fundamental rule that repeals by implications are not favored in law. *Thouvenin* v. *Rodrigues*, 24 Texas, 468 ; *Napier* v. *Hodges*, 31 Texas, 287. To constitute the repeal of a statute by implication, the new statute must cover the whole subject-matter of the old one, and prescribe different penalties. There must be an irreconcilable repugnancy between the two acts, and the repugnancy must be plain and unavoidable. *Cain* v. *The State*, 20 Texas, 370 ; Kent's Comm. 466, note *b* ; 37 Ind. 111, 284. Admit, for the sake of argument, that the provision of the new Code comes up, as insisted, to the full measure of this standard ; there is still another rule which lies at the very foundation, and which is the corner-stone, if we may so term it, of statutory construction, and that is that in interpreting a law the main object to be arrived at is the intention of the law-making power, and the interpretation to be given to the language used to express the intention should be such as to make the provisions of the statute consistent with reason. Bac. Abr., title " Statute," 238.

" The object, and the only object, of judicial investigation in regard to the construction of doubtful provisions of statute law *is to ascertain the intention of the Legislature which framed the statute.*"    Sedgw. on Stat. & Const. Law, 231. " Every interpretation that leads to an absurdity ought to be rejected."    *Kottwitz* v. *Alexander*, 34 Texas, 691 ; Vattel's Rules, Potter's Dwar. on Stat. 128.    " Every legislative act must have a reasonable construction."    Am. Rules, Potter's Dwar. on Stat. 154.    " An act is not repealed by implication where the Legislature had no intention to repeal it."    *Tyson* v. *Postlethwaite*, 13 Ill. 727.

We are of opinion that it would be inconsistent with reason to hold that the Legislature could have intended, in changing the penalty for murder in the first degree by the adoption of the Revised Statutes, that the statute changing it should repeal the preëxisting law, and have such an effect as to operate upon cases already tried, and pending on appeal.

This position is further strengthened by reference to other rules of statutory construction, to the following effect, viz. : "A thing within the *intention* is within the statute, though not within the letter ; and a thing within the letter is not within the statute unless within the intention."    Potter's Dwar. on Stat. 144 (8).    " The real intention, when accurately ascertained, will always prevail over the literal sense of the terms."    1 Kent's Comm., side-p. 462 ; *Brooks* v. *Hicks*, 20 Texas, 666. " It is a rule of construction generally to be adhered to in the construction of constitutions as well as statutes that they operate prospectively, unless the words employed or when the object in view and the nature and character of the provision clearly show that it intended a retrospective operation."    *Orr* v. *Rhine*, 45 Texas, 345 (citing 10 Ohio (N. S.) 588 ; 3 Ind. 258 ; 2 Kans. 432 ; 41 Mo. 453).

In *Lyon* v. *Fisk*, where a question analogous to the one we are considering came up for decision in the Supreme

Court of Louisiana, it was said: "Where the revision and formation into a code of the laws and jurisprudence of a country is effected, without a clause of repeal, as was the case with the Code of 1808, we hold the rule of interpretation to be, as in cases of successive statutes, that the law does not favor a repeal by implication unless the repugnance be quite plain; that the Code must be confined to repealing as little as possible of the preceding laws; that although a disposition of the Code may seem repugnant to some of those laws, that disposition must, if possible, have such construction that it may not be a repeal of those laws by implication." 1 La. An. 444.

And in *Wright* v. *Oakley* the language of Chief Justice Shaw is: " In construing the revised statutes and the connected acts of amendment and repeal, it is necessary to observe great caution to avoid giving an effect to these acts which was never contemplated by the Legislature. *In terms*, the whole body of the statute law was repealed; but these repeals went into operation simultaneously with the revised statutes which were substituted for them, and were intended to replace them, with such modifications as were intended to be made by the revision. There was no moment when the repealing act stood in force without being replaced by the corresponding provisions of the revised statutes. In practical operation and effect, therefore, they are rather to be considered as a *continuance* and modification of old laws than as an abrogation of those old and the reënactment of new ones. In order to construe them correctly, we must take the whole of the revised statutes, together with the act of amendment and the repealing act, and consider them in reference to the *known purposes* which the Legislature had in view in making the revision." 5 Metc. 406 ; *The State* v. *Brewer*, 22 La. An. 273.

Again, statutes in *pari materia* and relating to the same subject are to be taken and construed together, because it is to be inferred that they had one object in view, and were

intended to be considered as constituting one entire and harmonious system. *Taylor* v. *The State*, 4 Texas Ct. App. 169; *Napier* v. *Hodges*, 31 Texas, 287; 1 Pasc. Dig. Dec. 637, and authorities cited.

In *Smith* v. *The People*, the Court of Appeals of New York declare that " a statute should not be so construed as to work a public mischief, unless required by words of the most explicit and unequivocal import. (Citing *The People* v. *Lambier*, 5 Denio, 9.) In the construction of statutes, effect must be given to the intent of the Legislature whenever it can be discerned, though such construction seem contrary to the letter of the statute. That intent must be primarily sought in the language of the statute, and if the words employed have a well-understood meaning, are of themselves precise and unambiguous, in most cases no more can be necessary than to expound them in their natural and ordinary sense. The words in such case ordinarily best declare the intention of the Legislature. 11 Cl. & Fin. 86; 3 Seld. 97; 1 Kern. 593. These rules are elementary, but it is equally well settled that words absolute of themselves, and language the most broad and comprehensive, may be qualified and restricted by reference to other parts of the same statute in which they are used, and to the circumstances and facts existing at the time and to which they relate or are applied.  *  *  *  If, in reading a statute in connection with other statutes passed at or about the same time, a doubt exists as to the force and effect the Legislature intended to give to particular terms, — that is, as to the meaning which it was intended they should bear and have in the connection in which they are used, — it is also competent to refer to the circumstances under which, and the purposes for which, a statute is passed, to ascertain the intent of the Legislature. The ground and cause of the making of a statute explains the intent. Com. Dig. 11.  *  *  *  Again, statutes enacted at the same session of the Legislature should receive a construction,

if possible, which will give effect to each.    They are within the reason of the rule governing the construction of statutes in *pari materia."*    47 N. Y. 330.

And in *Austin* v. *G. C. & S. F. Railroad Company*, it was held by our Supreme Court that "laws relating to the same subject, enacted during the same session of the Legislature, are to be construed together, and are ordinarily to be taken as parts of the same act."    45 Texas, 234.

Now, in applying these principles to the question as raised in the case under consideration, we find the circumstances attending the adoption of our Revised Statutes were these : The act adopting the Penal Code and Code of Criminal Procedure was presented to the governor for approval on the 27th and the act adopting the Civil Statutes on the 28th of February, 1876, and both became a law without his signature on the seventeenth day of March, 1879 ; the former to take effect the 24th of July, 1879, and the Civil Statutes to become operative the first day of September, 1879.    In point of fact, the last legislation with reference to the Revised Statutes was the adoption of the "Final Title," "General Provisions," p. 718, which is intended, as far as practicable, to apply as well to the Codes as to the Civil Statutes.    If not satisfactorily settled by the principles of law above enunciated, we hold that the question under discussion is settled by the positive provisions of the sixth section of the "Final Title," which reads as follows : "That no offence committed, and no liability, penalty, or forfeiture, either civil or criminal, incurred, prior to the time when any statute, or part thereof, shall be repealed or altered by the Revised Statutes, shall be discharged or affected by such repeal or alteration ; but prosecutions and suits for such offences, liabilities, penalties, or forfeitures shall be instituted and proceeded with in all respects as if such prior statute, or part thereof, had not been repealed or altered, except that when the mode of procedure or matters of practice have been changed by the Revised Statutes, the

procedure had after the Revised Statutes shall have taken effect, in such prosecution or suit, shall be, as far as practicable, in accordance with the Revised Statutes." Rev. Stats. 718.

Having disposed of this question, we will proceed to consider the matters growing out of the conduct of the trial on the merits, which are complained of as error.

1. A very interesting subject is earnestly argued by counsel in his brief, which is not presented in a manner authorizing that we should consider it. We allude to the admission of the confessions of the defendant in evidence. It is urged that counsel was taken by *surprise* with regard to this confession, because of the fact that the same witness who upon this trial testified that, before the confession, the justice of the peace had cautioned defendant that the confession might be used against him (Pasc. Dig., art. 3127), had testified at the former trial and proved no such fact. And in support of his right to a reversal upon this ground, we are cited to the case of *Boxley* v. *The Commonwealth*, 24 Gratt. 649, and 1 Hawley's Am. Cr. Rep. 655, wherein it was held that, "if the testimony of the principal witness for the prosecution on the trial varies materially from that given by the same witness before the committing justice, who is unexpectedly absent from the trial, the prisoner is entitled to a new trial on the ground of surprise." Such is not the rule of practice in this State. "Surprise" is not one of the grounds for new trial in felony cases, all of which grounds are prescribed by our statute. Pasc. Dig., art. 3137; Rev. Stats., Code Cr. Proc., art. 777. With us, "a continuance may be granted on the application of the State or defendant, after the trial has commenced, when it is made to appear to the satisfaction of the court that by some unexpected occurrence since the trial commenced, which no reasonable diligence could have anticipated, the applicant is so taken by surprise that a fair trial cannot be had; or the trial may be postponed to

a subsequent day of the term." Pasc. Dig., art. 2193; Rev. Stats., Code Cr. Proc., art. 568. To have availed himself of the surprise, the defendant should have applied for a continuance, or have asked a postponement of the case, to enable him to properly controvert or meet the matter which operated the surprise. *Higginbotham* v. *The State*, 3 Texas Ct. App. 447.

No objection was raised on the trial to the admission in evidence of the defendant's confessions, and defendant cannot now be heard to complain that they were illegal and inadmissible. There might have been much force in the argument of counsel had these confessions been admitted over objection, and the question properly presented for revision. "Although no unbending, universal rule can be laid down by which to determine whether subsequent confessions in a criminal case are admissible when the former confessions were obtained by improper influences, yet in each case the inquiry must be whether, considering the degree of intelligence of the prisoner, and all the attendant circumstances, it is affirmatively shown that the effect of the primary improper inducement was so entirely obliterated from his mind that the subsequent confession could not have been in the slightest degree influenced by it; and if there be any doubt on this question, it must be resolved in favor of the prisoner, and the confession must be excluded." *Porter* v. *The State*, 50 Ala. 95; 1 Greenl. on Ev., sect. 221; *Barnes* v. *The State*, 36 Texas, 363. But, as stated above, no objection was made and no bill of exceptions saved to the introduction of this evidence. "As far as can be seen from the record, the evidence to which objection is now made went to the jury without objection. That this cannot be done for the first time in this court has become long since too well settled to be the subject of comment, or to require the reference to authority in its support. No reason is assigned, and none is seen, why evidence of the particular character now in question should furnish an exception to the

rule." *Johnson* v. *The State*, 27 Texas, 758; *Brown* v. *The State*, 2 Texas Ct. App. 115; *Poe and Robinson* v. *The State*, 32 Texas, 65; *Smith* v. *The State*, 1 Texas Ct. App. 133; *Owens* v. *The State*, 4 Texas Ct. App. 153; Pasc. Dig., art. 3068; Rev. Stats., art. 686.

The question as to whether this confession was freely and voluntarily made was, it seems, twice passed upon in the trial: first by the judge, when he admitted it in evidence, and then again by the jury under the following charge from the court: "In regard to the evidence of the confession of the defendant, you are charged that you will consider such evidence if you find that one was freely and voluntarily made by defendant after he had first been cautioned that such confession might be used against him; but if you believe that defendant made a confession but it is not shown to have been freely and voluntarily made, or if it is shown by the evidence to have been made upon compulsion or persuasion, you will reject it from your consideration in making up your verdict." Whether it was a question alone for the judge or alone for the jury to pass upon, it is unnecessary to decide, since it seems to have been passed upon by both. *Hauck* v. *The State*, 1 Texas Ct. App. 357; *Estrado* v. *The People*, 49 Cal. 171.

There is but a single bill of exceptions exhibited in the record, and this was saved to the admission in evidence of proof with regard to foot-tracks made by defendant in Justice Joiner's office whilst he was under arrest. Just after the discovery of Maj. Munroe's murder, some parties present commenced examining for any signs or evidence left by the perpetrator at the house and around the premises. Footprints were found in the house, at a window, and in the peach-orchard, which were measured by the witnesses, one of whom was George Grimes. The portion of his testimony which was objected to on the trial was as follows: "I saw the same measure applied to a track in Judge Joiner's office at Bremond. Joiner made the defendant

make his track in the ashes and sand in his office, where a stove had been. The impression made was plain, and it was about the same as tracks made in Munroe's house. The measure was applied to the footprints in Joiner's office, and it was the same in every particular, — fitted it exactly."

It is contended that the evidence was incompetent and inadmissible, because it was evidence which defendant was compelled to make and give against himself, in contravention of the tenth section of the Bill of Rights, art. 1 of the Constitution, which declares that one accused of crime shall not be compelled to give evidence against himself.

This identical question was presented in the case of *The State* v. *Graham*, 74 N. C. 646. Rodman, J., delivering the opinion of the court, says: " The object of all evidence is to elicit the truth. Confessions which are not voluntary, but are made either under the fear of punishment if they are not made, or in the hope of escaping punishment if they are made, are not received as evidence, because experience shows that they are liable to be influenced by those motives, and cannot be relied on as guides to the truth. But this objection will not apply to evidence of the sort before us. No fears or hopes of the prisoner could produce the resemblance of his track found in the cornfield. This resemblance was a fact calculated to aid the jury, and fit for their consideration." After citing Best on Evidence, sect. 183, and other authorities, the learned judge proceeds to say further: " If an officer who arrests one charged with an offence has no right to make the prisoner show the contents of his pocket, how could the broken knife or the fragment of paper corresponding with the wadding have been found? If, when a prisoner is arrested for passing counterfeit money, the contents of his pockets are secured from search, how can it ever appear whether or not he has on his person a large number of similar bills, which, if proved, is certainly evidence of *scienter?* If an officer sees a pistol projecting from the

pocket of a prisoner arrested for a fresh murder, may he not take out the pistol against the prisoner's consent, to see whether it appears to have been recently discharged? Suppose it be a question as to the identity of the prisoner, whether a person whom a witness says he saw commit a murder, and the prisoner appears in court with a veil or a mask over his face, may not the court order its removal in order that the witness may say whether he was the person whom he saw commit the crime?" * * * The conclusion reached is thus summoned up: "We agree in the opinion that when the prisoner, upon being required by the officer to put his foot in the track, did so, the officer might properly testify as to the result of the comparison thus made. It is unnecessary to say whether or not the officer might have compelled the prisoner to have put his foot in the tracks, if he had persisted in not doing so." See this case of The State v. Graham, supra, also reported in full in 1 Am. Cr. Rep. (Hawley) 182.

The question here is essentially different from the one before the Supreme Court of Tennessee in Jerry Stokes v. The State (March 11, 1876), cited by counsel, where a pan of soft mud was brought into the court-room on the trial, and the prisoner was asked in the presence of the jury to put his foot into it, which he declined to do. The reversal in that case was upon the ground that the prisoner was asked in the presence of the jury to make evidence against himself, and because, the court say, they " are satisfied the jury were improperly influenced thereby. * * * The bringing in of the pan of mud and the request of the attorney-general was improper, and should not have been permitted by the court." Stokes v. The State is also reported in 2 Texas L. J. 243.

We have examined this case with great care, and have endeavored to meet all the points made by the able counsel who has without fee followed the cause of his client through two trials in the lower and two appeals in this court. He

has made a most urgent appeal to us upon the law and the facts in the case. We cannot concur with him in his belief that any such error has been committed on the trial as requires that the judgment should be reversed. Defendant has had a fair and impartial trial, so far as this record discloses, and in which his rights have been fully guarded and protected. That he is guilty of the crime of murder, a horrible murder by assassination, prompted to the deed by his lust for the few paltry dollars in the possession of the murdered old man, the court and jury below did not doubt, and we do not doubt, if the record before us, as we presume, speaks the truth of the matter; that he has justly forfeited his life by his crime we are equally as well satisfied, and the judgment is therefore affirmed.

*Affirmed.*